236 P.2d 949

ZELLERS et al. v. HUFF et al.

No. 5332.

Supreme Court of New Mexico.
Sept. 20, 1951.

Harry L. Bigbee, Santa Fe, for appellants.

Watson, McIntosh & Watson, Santa Fe, John A. Danaher, Washington, D. C., for appellees.

Joe L. Martinez, Atty. Gen., Philip H. Dunleavy, Ass't Atty. Gen., for the State of N. Mex.

R. Lawrence Siegel, New York City, Pearce C. Rodey, Albuquerque, amici curiae.

McGHEE, Justice.

This is a class action brought under Sections 19–101, rule 23(a) and 19–601, N.M. S.A., 1941 Comp., by the plaintiffs as citizens, taxpayers and parents of school children for themselves and others similarly situated seeking a declaratory judgment and injunctions against members of the State Board of Education, as such, members of the County, Independent or Municipal Boards of Education having jurisdiction of the schools involved, R. H. Grissom as State Educational Budget Auditor and various Sisters and Brothers who are members of Roman Catholic Religious Orders teaching in the affected schools.

The general objects of the first cause of action were to have the teaching of sectarian religion in the public schools declared illegal, to bar permanently certain teachers from teaching in the public schools for having taught sectarian religion therein, to have all members of Roman Catholic Religious Orders declared ineligible to teach in the public schools of the state, and to have the expenditure of public funds in aid of Roman Catholic parochial schools declared illegal. In the second cause of action injunctions were asked to put into effect the declarations of law which might be made in the declaratory judgment.

Under our statutes the County, Town and Independent Boards of Education named as defendants employed and had the supervision of the Sisters and Brothers (hereafter called the Religious) as teachers. Many additional facts regarding the Religious were pleaded, but it would unduly lengthen this opinion to detail them.

An abstract of the material facts as found by the trial court will be set out hereafter and serve as a guide for the declarations of law made by the trial court and to be made by us. For purposes of simplicity and brevity specific findings applicable to a number of schools have been grouped together under single statements; some findings have been incorporated in others; and the schools concerned have, in the main, been treated in two groups, the first being those found by the trial court to be parochial schools of the Roman Catholic Church, and the second being those where

there is no separation between the Roman Catholic Church and the State of New Mexico, although not declared by the trial court to be parochial schools.

Digest of Facts Found by the Trial Court

1. Plaintiffs brought this action on behalf of themselves and other residents, taxpayers and parents of children of school age similarly situated.

2. Plaintiffs have no adequate remedy at law.

3. An actual controversy exists between the plaintiffs and all defendants herein.

4. The statutes of the State of New Mexico provide an administrative remedy, but that remedy in a situation as here presented is one of form and not of substance, and plaintiffs have exhausted said remedy prior to the filing of the petition herein.

5. There is no separation between the Roman Catholic Church and the State of New Mexico in the following named schools, all located in the State of New Mexico:

First Group
Santa Rita Grade School, Carrizozo
Mount Carmel School, Socorro
St. Mary's School, Belen
San Fidel School, Valencia County
St. Nicholas Grade School, Sandoval County
Sacred Heart Academy Grade School, San Juan County
Lumberton School, Rio Arriba County
Park View School, Rio Arriba County
Penasco School, Taos County
Old Town Junior High School, Las Vegas
St. Francis School, Ranchos de Taos
St. Joseph's School, Rio Arriba County

Second Group
Cubero School, Valencia County
Cuba School, Sandoval County
Pena Blanca School, Sandoval County
Blanco Grade School, San Juan County
Chama School, Rio Arriba County
Dixon School, Rio Arriba County
San Juan School, Rio Arriba County
Pecos Independent School District, Pecos
Santa Cruz School, Santa Fe County
Costilla School, Taos County
Villanueva School, San Miguel County
Ribera School, San Miguel County
Mora School, Mora County

6. All of the schools named in these findings are situated in the Archdiocese of Santa Fe, except the schools in Cubero and San Fidel, Valencia County, and Blanco, San Juan County, which are located in the Archdiocese of Gallup, New Mexico.

7. The schools comprising the first group above are, in fact, Roman Catholic parochial schools being subsidized in part by funds raised through taxation by the State of New Mexico through the employment of teachers, furnishing of free bus transportation and free text-books; and funds so expended are used in furtherance of the dissemination of Roman Catholic religious doctrines to students attending these schools in compliance with the New Mexico compulsory attendance law. In all of the schools named in the first group, the following conditions exist, to-wit:

(a) Church buildings owned by the Roman Catholic Church are used five days each week during the school term for school buildings.

(b) Religious are employed as teachers by the State of New Mexico and paid as such from funds raised through taxation in the State of New Mexico.

(c) Pupils attending these schools are given religious instruction in the principles of the Roman Catholic Church, commonly known as the catechism, during school hours by the Religious employed as teachers by the State of New Mexico.

(d) Students are taught and recite prayers during school hours which are peculiar to the Roman Catholic Church.

(e) Roman Catholic literature, pamphlets, leaflets and comic books are distributed to the students during school hours.

Certain variations in these practices are found from school to school and are detailed hereafter, to-wit:

(a) Lumberton School, Rio Arriba County, and Old Town Junior High School, Las Vegas, are not named as schools receiving free bus transportation for their pupils.

(b) Park View School, Rio Arriba County, and St. Francis School, Ranchos de Taos, are schools in which religious instruction was given during school hours by the parish priests of the Roman Catholic Church.

(c) Students at Santa Rita School, Carrizozo, were not found to have been learning or reciting prayers peculiar to the Roman Catholic Church during school hours.

(d) Neither the Santa Rita School, Carrizozo, nor the Lumberton School, Rio Arriba County, were declared to be distributing Roman Catholic literature, etc., to their students during school hours.

(e) St. Joseph's School in Dixon, Rio Arriba County, is not included in some of the findings made by the court common to all of the parochial schools, but the court specifically found this school is in fact a Roman Catholic parochial school being aid-

ed by the State of New Mexico through funds produced by taxation in the employment of teachers, the furnishing of bus transportation and text books without charge. (There is abundant evidence that the procedure followed in this school is essentially the same as that followed in the remainder of the schools found to be parochial.)

8. With respect to the schools enumerated in the second group, the court found:

(a) Religious are employed to teach in all of these schools by the State of New Mexico and paid out of tax funds. Free text books and free bus transportation are furnished the pupils in said schools through funds raised by taxation by the State of New Mexico, and funds so expended are used in furtherance of the dissemination of Roman Catholic religious doctrines to students attending in compliance with the New Mexico compulsory attendance law.

(b) In every school religious instruction in the principles of the Roman Catholic Church is given pupils during school hours by the Religious employed as teachers and paid by the State of New Mexico out of tax funds.

(c) In ten of these schools students, during school hours, are taught and recite prayers peculiar to the Roman Catholic Church. (Santa Cruz School, Costilla School and Villanueva School not being included in this finding.)

(d) Church buildings owned by the Roman Catholic Church are used five days each week during the school term in ten of these schools (there being no finding as to Chama School, Pecos Independent School District and Ribera School.)

(e) Roman Catholic literature is distributed during school hours in seven of these schools, to-wit: Cubero School, Blanco Grade School, San Juan School, Santa Cruz School, Costilla School, Villanueva School and Mora School.

9. Tierra Amarilla School, Rio Arriba County, is not included in the number of schools where the court found there was no separation of the State of New Mexico and the Roman Catholic Church, however, by the findings of the court, this school observed all the practices as the schools enumerated in the second group, except that church buildings were not there used for school buildings.

10. In certain of the schools from each group, parochial and otherwise, students are released from school attendance during school hours for the purpose of attending mass or confession held in the Roman Catholic Church, and there are pictures on the walls of the schoolrooms portraying themes peculiar to the Roman Catholic Church.

11. With respect to all of the schools in both groups, the court found the children attending said schools are under the supervision of the teachers from the time

they arrive on the school ground and so long as they remain thereon at the end of the school day.

12. A complete line of text books has been adopted by the State of New Mexico for use in Catholic schools only and is furnished to the Catholic parochial schools and certain public schools without charge.

13. The Religious are employed as teachers and are paid salaries by the State of New Mexico out of funds produced by taxation in each of the schools involved, with the exception that in some schools the salaries are paid direct to the religious order to which the particular Religious belongs.

14. All of the Religious named as defendants were dressed in the distinctive garb of their Order at all times while school was in session and in a number of schools the Religious are employed to teach in said school by the Superior member of the Order to which they belong.

15. In 1941 the Rio Arriba County Board of Education entered into a contract with the Mother Superior acting on behalf of the Franciscan Sisters of Our Lady of Perpetual Help, wherein said Board agreed to employ Sisters of said Order for a period of not less than five years, which contract was approved by the Archbishop of the Catholic Church in St. Louis, Missouri.

16. All of the defendant Religious were, or had been at times material to this case, conducting regular classes of instruction in the principles of the Roman Catholic Church during school hours to students attending school in compliance with the New Mexico compulsory attendance law, except defendant Sisters named as teachers in the schools at Abiquiu, Tucumcari, and in the Catron County schools, all in New Mexico.

17. Students attending school at Abiquiu are taught the principles of the Roman Catholic Church by Sisters, not employed by the State of New Mexico, in the Catholic Church at Abiquiu immediately after the school buses arrive each school day and before secular classes commence.

18. The Old Town Junior High School at Las Vegas and the Sacred Heart Academy Grade School in San Juan County are owned by the Christian Brothers, an Order of the Roman Catholic Church, and the physical plant is under the direction, control and supervision of the Brother Superior of said Order.

19. The Catholic Brothers who were employed as teachers in the Old Town Junior High School, Las Vegas, refused to teach female students and additional teachers were employed and likewise paid out of tax funds for the purpose of teaching classes composed of girls.

### Summation of Facts.

The record and trial court findings clearly establish that a part of the schools in-

volved in this appeal (if not all except the Abiquiu school) were operated as Roman Catholic parochial schools where the Religious taught. The following practices were extant in these schools.

School bus schedules were so set that in schools where sectarian religion was taught between the hours of 8:30 and 9:00 in the morning, buses would arrive at 8:30; or, where religious training was given in the afternoon at the end of regular classes, buses did not leave until the conclusion of the thirty minute period of religious instruction. The large majority of pupils were transported by bus and the above outlined procedure was followed in all schools except perhaps two or three which did not have bus service.

Non-Catholic children were of necessity required to attend religious instruction and services during inclement weather where the schools did not have a library or assembly room, and even in such schools they were required to be present and hear Roman Catholic prayers.

The compulsory school attendance law served as a vehicle for getting the children to school and religious instruction. Catholic literature was distributed by the Religious to the pupils at the public schools.

Two sets of free text-books were adopted by the State Board of Education—one for the public schools and the other for Roman Catholic parochial schools—the latter being delivered free of charge to both classes of schools.

Many of these schools displayed Roman Catholic religious pictures of various kinds on their walls.

A number of the Religious testified they did this or that in connection with religious instruction on the orders of the local priest who, they say, was their religious superior.

The Religious who taught in the public schools were selected and assigned to various schools by the heads of their respective Orders and were accepted by the school boards without question. In addition, transfers and substitutions were made at will by the same authority and these were likewise accepted by the boards. Indeed, in this extremely long record involving so many schools in different counties, there is only one instance where a County Board of Education attempted to assert its authority in the selection of a teacher and that was in the Cuba School in Sandoval County. There the board asked the Mother Superior of the Order not to send back the principal of the Cuba School for the coming school year, but requested that two other Sisters be retained there as teachers. The request went unanswered for months but the Mother Superior finally appeared at Cuba, questioned the local resident of the Board, said the complaint against the principal was trivial, that she would not have her Sisters shoved around and if there were any more complaints about her Sisters

she would take all of them out of the school. The Sister to whom the Board had objected was returned to the school for the following year and the Sisters the Board had desired to retain were transferred.

In short, New Mexico had a Roman Catholic school system supported by public funds within its public school system.

### History of Present Controversy.

A showdown finally came between irate school patrons, some of whom are plaintiffs in this case, and the school authorities over the teaching of religion in the Dixon schools, a rural community where the Roman Catholics and Protestants are about evenly divided. Public school had been held in that district for many years in Church property with Religious as teachers. The Protestants objected to the holding of public school in Roman Catholic owned buildings where Sisters taught the regular curriculum and in addition taught sectarian religion, but were advised by the County Board of Education that funds were not available to erect a public school building. The Protestants then donated money and labor, erected a school building, gave it to the county and asked that it be opened and staffed with lay teachers. This request was denied and the new school was placed under a Sister as principal and the teaching of sectarian religion continued. Later a committee of Protestants appeared before the County Board of Education and demanded, among other things, that it stop the teaching of sectarian religion in the Dixon schools. The Board held it did not have jurisdiction and declined to act, referring the protestors to the State Board of Education. They then appeared before the State Board and were told it was an appellate board and as it had no written appeal it could do nothing. The committee offered to make a tender of proof in support of their protests but the offer was summarily denied following an objection by an attorney who later represented the Religious at the trial of this case. The meeting evidently waxed warm and for the first time the members of the State Board became exercised over the matter. After the protestors had been dismissed and the Board had been in practically closed session for a time the State Superintendent of Public Instruction, who was also a member ex-officio of the State Board, called on the Archbishop of the Diocese of Santa Fe, the Very Reverend Edwin V. Byrne, and solicited his help. Another meeting of the Board was held and finally the directive relative to the operation of the school at Dixon was adopted, the material portion of which is as follows:

"In an earnest effort to solve the community school problems of Dixon, the State Board of Education recommends and insists that the following plan be carried out:

"1. That the new school recently completed at Dixon teach the first six grades, including the pre-first.

"2. That this new school have all qualified lay teachers, with a lay principal.

"3. That the public school, taught by Catholic Sisters, teach the 7–12 grades.

"4. That school buses bringing children to Dixon run on a schedule that would bring the children to school in time, but not necessarily earlier.

"5. That no religious instruction be given in either school by the teachers on school days. * * *" (Minutes of the State Board of Education, September 15, 1947.)

The Archbishop directed a letter to all Religious teaching within the Archdiocese of Santa Fe, which, omitting formal parts, reads as follows:

"In view of the present agitation against Sisters in Public Schools and to avert grave future difficulties that could prove disastrous to the continuation of Sisters in public schools in the State of New Mexico, I request that no religious instructions be given in public school buildings by the teachers on school days. Catechism should be taught on Saturdays and Sundays.

"School buses bringing children to school will run on a schedule that will bring the children to school in time, but not necessarily earlier, and will leave immediately after school."

A special letter accompanied the copy of the foregoing letter sent to the Religious at Dixon in which the Archbishop advised the Religious to remove all religious emblems from public school rooms, forbidding the saying of prayers or giving of religious instruction in the school on school days, and further stating that if any Sister did not obey these orders, her removal from the Dixon school would be effected.

The Archdiocesan Superintendent of Roman Catholic School in the Diocese of Santa Fe, Monsignor Bradley, accompanied two representatives of the Department of Education to Dixon to put the directives into effect. School was being held in the public school building and in the church property rented by the county. At that time the teachers in the church property were Sisters and those in the public school were lay teachers. Monsignor Bradley delivered the orders to the Sisters and then the representatives of the Department of Education gave the orders of the State Board to the lay teachers at the public school. The directives did not at that time effectively stop the teaching of sectarian religion. The State Board of Education did not give any orders to any other schools.

Thus it is apparent that it is the Archbishop to whom the people of New Mexico are indebted for the cessation of sectarian religious training in public schools where

members of Roman Catholic Orders taught, and not the public officials charged with such duty. Note the language of his directive quoted supra. He not only directed that the teaching of religion be stopped on school days, but also directed a change in the arrival and departure times of the school buses.

### Judgment of the Lower Court.

Some portions of the declaratory judgment will be abstracted and others set out in full, our numbering corresponding to that of the judgment.

1. That 139 of the defendants (Religious) be forever barred from receiving any school moneys and employment in the public schools of New Mexico.

2. That school students are subject to the supervision of school authorities and teachers from the time that they arrive at the school in the morning until they leave in the afternoon and this entire period of time is hereby adjudged and decreed and declared to be a part of the school day for all such children.

3. That Section 17, Article 20 of the Constitution of the State of New Mexico requires that the members of the New Mexico State Board of Education adopt a uniform system of textbooks.

4. That the adopting of sectarian indoctrinated textbooks and furnishing the same to the tax supported schools of the State of New Mexico by the State of New Mexico or the members of the New Mexico State Board of Education violated Section 4, Article 21 of the Constitution of the State of New Mexico and the First Amendment to the Constitution of the United States as made applicable to the states by the Fourteenth Amendment to the Constitution of the United States.

5. That the furnishing of free textbooks to schools other than tax supported schools of this State, violates Section 14, Article 9 of the Constitution of the State of New Mexico and Section 3, Article 12, of the Constitution of the State of New Mexico.

6. That the furnishing by the State of New Mexico of sectarian indoctrinated textbooks or textbooks for Catholic schools only to private parochial schools is in violation of the First Amendment to the Constitution of the United States.

7. It is hereby adjudged, decreed and declared that the furnishing by the State of New Mexico of free school bus transportation to pupils of parochial schools is in violation of Section 3, Article 12 and Section 14, Article 9 of the Constitution of the State of New Mexico and the First Amendment to the Constitution of the United States as made applicable to the states by the Fourteenth Amendment of the Constitution of the United States.

8. That the teaching of sectarian doctrine in the tax supported schools of this State violates Section 4, Article 21 of the

Constitution of the State of New Mexico and Section 9, Article 12 of the Constitution of the State of New Mexico and the First Amendment to the Constitution of the United States as made applicable to the states by the Fourteenth Amendment to the Constitution of the United States.

9. That the holding of tax supported school classes in buildings which have religious emblems such as crosses, grottos, religious statuary and religious pictures, all·peculiar to a certain denomination, violates the First Amendment to the Constitution of the United States as made applicable to the states by the Fourteenth Amendment to the Constitution of the United States.

10. That the holding of tax supported school classes in a building owned by the Roman Catholic Church or an Order thereof or an official thereof, part of said building being retained by said Order, Church or Official for use as a private or parochial school is in violation of the First Amendment to the Constitution of the United States as made applicable to the states by the Fourteenth Amendment to the Constitution of the United States.

11. It is hereby adjudged, decreed and declared that there is no separation between Church and State as contemplated and required by the First and Fourteenth Amendments to the Constitution of the United States in 27 named schools in New Mexico.

12. The members of the State Board of Education, all local boards of education and their members who are named as defendants were declared to be barred and prohibited from renting, leasing or acquiring for use in any way buildings or space in buildings for use as public school or public school rooms when such building does not remain under the absolute control of the state or one of its subdivisions or when such building is of a nature to exert a sectarian influence.

13. The providing or authorizing free school bus transportation for pupils attending a parochial or sectarian school was declared unlawful, and the members of the State Board of Education were prohibited from authorizing or furnishing it.

14. The furnishing or providing of free textbooks for private, parochial or sectarian schools was adjudged unlawful, and the members of the State Board of Education were prohibited from furnishing such books to such schools, or using tax funds for such schools.

15. That the furnishing or providing, buying or contracting for or authorizing sectarian indoctrinated textbooks as a part of the State's free textbook system by the members of the State Board of Education is hereby declared to be illegal.

16. That it is unlawful to make or approve any budget providing for the payment of public funds to any of the defend-

ants herein who are teaching sectarian doctrine in the tax supported schools of this State by the defendant, R. H. Grissom. (State Educational Budget Auditor)

17. That 12 named schools are in fact Roman Catholic parochial schools being illegally subsidized in part by funds raised through taxation by the State of New Mexico.

18. That public funds expended by the State of New Mexico in furnishing bus transportation for pupils and free text books are illegally used in furtherance of the dissemination of Roman Catholic doctrines to students attending in compliance with the New Mexico compulsory attendance law in 24 named schools.

On the second cause of action the following judgment was entered:

1. That each of the defendants listed in paragraph numbered one above of the portion of this judgment and decree relating to the first cause of action, be and the same are each hereby permanently enjoined and restrained from henceforth receiving any school moneys or employment in the public schools of this State.

2. That the defendants named and designated in paragraph twelve of this judgment relating to the first cause of action be and each of them are hereby permanently enjoined and restrained from permitting, allowing or consenting to the transportation of pupils attending parochial schools by transportation furnished by the State of New Mexico in connection with the furnishing of school bus transportation.

3. That each defendant named in the complaint herein as being a member of the State Board of Education or member of any other board of education and all boards of education named as defendants in this action who are named and designated in paragraph numbered twelve of the portion of this judgment relating to the first cause of action and each of them are hereby permanently enjoined and restrained from permitting or allowing the holding of tax supported school classes in buildings which have religious emblems, such as crosses, grottos, religious statuary and religious pictures peculiar to a certain denomination or in allowing the holding of tax supported school classes in a building or buildings owned by the Roman Catholic Church or an Order thereof or an Official thereof when part of said building is retained by said Church, Order or Official for use as a private or parochial school and are hereby enjoined and restrained from renting, leasing or acquiring for use in any way buildings or space in buildings for use as a public school or public school room when said building does not remain under the absolute control of the State or one of its subdivisions or when such building is of a nature to exert a sectarian influence.

4. That the defendants, Raymond Huff, Floyd D. Golden, Miss Margaret Kennedy,

Mrs. Aileen Roat, Adelino Sanchez, Thomas J. Mabry and Charles L. Rose, being members of the State Board of Education of the State of New Mexico, be and the same are hereby permanently enjoined and restrained from:

(a) Adopting a system of free textbooks that is not uniform.

(b) Adopting or furnishing sectarian indoctrinated textbooks to tax supported schools of the State of New Mexico.

(c) Furnishing free textbooks to schools other than tax supported schools of the State of New Mexico.

(d) Furnishing sectarian and indoctrinated textbooks or textbooks for Catholic schools only to private or parochial schools at the expense of the State of New Mexico.

(e) Providing, permitting or authorizing free school bus transportation for pupils attending a parochial or sectarian school.

5. That the defendant, R. H. Grissom, is hereby permanently enjoined and restrained from approving or making any budget providing for the payment of public funds to any of the defendants herein named in paragraph numbered one of the portion of this judgment and decree relating to the first cause of action.

6. That the County Board of Education of Rio Arriba County and its members, to-wit: H. H. Kramer, J. C. Martinez, Albert Amador, Jr., Augustine Vigil, and Juan B. Martinez, be and the same are each hereby enjoined and restrained from allowing or permitting the holding of tax supported school classes in the portion of the St. Joseph's School in Dixon that was used at the time of hearing in this cause partly for the holding of a parochial school and partly for the conducting of high school classes supported by tax funds.

7. That the defendants herein who are members of any Board of Education named as defendants herein and all boards of education who are named as defendants herein the same being named in paragraph numbered twelve of the portion of this judgment and decree relating to the first cause of action be and each of them are hereby enjoined and restrained from using or permitting the use of tax funds for the purpose of subsidizing parochial schools.

8. That all defendants other than those named as Sisters, Brothers or Reverends are hereby enjoined and restrained from conducting, permitting, or authorizing the operation or paying tax funds to schools in the State of New Mexico designated and referred to in this action during any period of time when said schools or any of them named and designated in paragraph numbered eleven of the portion of this judgment and decree relating to the first cause of action are conducted or operated under circumstances found by this Court as existing in its decision resulting in a failure to separate the Church and State as found by this Court is required by the

First and Fourteenth Amendments to the Constitution of the United States or to pay or permit the use of public funds for the hiring of teachers, furnishing of free textbooks or free school bus transportation to any parochial school or schools where there is no separation between church and state as contemplated by the First and Fourteenth Amendments of the Constitution of the United States.

The plaintiffs appealed in an effort to get more relief than was granted by the trial court.

The Attorney General appealed on behalf of the members of the State Board of Education and Educational Budget Auditor, but as he has not filed assignments of error we will not further notice his appeal, save on the right of the plaintiffs to maintain a declaratory judgment action against the State officers.

The Religious who were enjoined from again teaching in New Mexico likewise appealed.

Question of Mootness of Appeal.

The Religious appellees urge the questions raised by appellants in their brief (the teaching of religion, teaching by the Religious in public schools, teaching in religious garb and the failure of the court to enjoin all Religious named as defendants who have taught in the public schools) are moot for the following reasons:

1. Teaching of religion by the Religious on school days has been discontinued since the direction so to do by the Archbishop of the Diocese of Santa Fe, New Mexico, by his directive to all the Religious teaching in public schools set out above in the portion of this opinion designated "History of Present Controversy".

2. The State Board of Education by resolution dated March 6, 1951, adopted a policy of prohibiting the wearing of religious garb by teachers in the public schools of New Mexico, declaring that church property shall not be used for public school purposes except in cases of emergency, the resolution, omitting recitals, reading as follows:

"It Is Hereby Resolved and Adopted as the policy of this board that all nuns, brothers, or priests of the Catholic Church, or members of any other sectarian religious group, wearing clothing of religious significance, should be removed from the public schools throughout the state as expeditiously as circumstances (of) each locality allows; and, it is further adopted as the policy of this board that insofar as possible no property owned by religious groups shall be leased or rented by the state from such religious or sectarian organization unless exceptional circumstances require such action."

3. Following the adoption of the foregoing resolution by the State Board of

Education, the Archbishop of the Diocese of Santa Fe advised the State Board of Education that contracts by Religious would not be renewed at the close of the 1950–1951 school year, and that no Church property in this state was being used for public school purposes. The material part of his letter reads as follows:

"Please be advised that contracts by Religious teaching in the Public Schools of New Mexico, will not be renewed at the close of the present school year.

"Moreover, it should be noted, there is no Church property in the State of New Mexico being used by the Public Schools.

"I am submitting these advices to the end that you will have been informed, well in advance, so that you may make appropriate plans for the coming school year."

We were advised at the argument in June that no Religious would be employed as teachers in the public schools of New Mexico for the 1951–1952 school year.

The State Board has now adopted a uniform system of text books and we are advised it no longer furnishes any school books to sectarian or denominational schools.

If the State Board of Education and the Archbishop continue the policies announced in the resolution and letter just quoted, then, indeed, the conditions of which plaintiffs so strongly complain would be entirely eliminated; but we must remember the membership of the Board changes somewhat with each administration and we have changes from time to time in the individual holding the high Church office of Archbishop. Lacking an authoritative declaration of law on the subjects the individuals holding such offices may change their policies when and as they might be advised. We decline to treat the questions as moot and will proceed to a decision of the matters raised by the appeal of the appellants and the cross appeal of the Religious.

Applicable Constitutional Provisions.

Many of the assignments of error made by the plaintiffs relate to the right of the Religious to teach in the public schools, wear religious garb while teaching, draw public money for acting as such teachers, and further urge that payment of tax money to such members is, in fact, an aid to a religious order in aid of its particular religion (as the Religious all take vows of poverty and turn their earnings over to their respective orders) all in violation of the First Amendment to the United States Constitution, provisions of our Enabling Act and certain sections of our state Constitution. Therefore, we quote hereafter various constitutional and statutory provisions relative to the separation of church and state and to our schools.

The First Amendment to the Constitution of the United States reads: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

This provision is made applicable to the states by the Fourteenth Amendment of the United States Constitution, Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, 168 A.L.R. 1392.

Section 2 of the Enabling Act for New Mexico, Act of June 20, 1910, 36 Statutes at Large 557, Ch. 310, reads in part:

"And said convention (meaning our constitutional convention) shall provide, by an ordinance irrevocable without the consent of the United States and the people of said State—

"First. That perfect toleration of religious sentiment shall be secured, and that no inhabitant of said State shall ever be molested in person or property on account of his or her mode of religious worship; * * *.

"Fourth. That provision shall be made for the establishment and maintenance of a system of public schools, which shall be open to all the children of said State and free from sectarian control, and that said schools shall always be conducted in English. * * *

"All of which ordinance described in this section shall, by proper reference, be made a part of any constitution that shall be formed hereunder, in such terms as shall positively preclude the making by any future constitutional amendment of any change or abrogation of the said ordinance in whole or in part without the consent of Congress."

The following are quotations from our New Mexico Constitution:

"Every man shall be free to worship God according to the dictates of his own conscience, and no person shall ever be molested or denied any civil or political right or privilege on account of his religious opinion or mode of religious worship. No person shall be required to attend any place of worship or support any religious sect or denomination; nor shall any preference be given by law to any religious denomination or mode of worship." Art. 2, Sec. 11.

"Neither the state, nor any county, school district, or municipality, except as otherwise provided in this constitution, shall directly or indirectly lend or pledge its credit, or make any donation to or in aid of any person, association or public or private corporation, * * *." Art. 9, Sec. 14.

"A uniform system of free public schools sufficient for the education of, and open to,

all the children of school age in the state shall be established and maintained." Art. 12, Sec. 1.

"The schools, colleges, universities and other educational institutions provided for by this constitution shall forever remain under the exclusive control of the state, and no part of the proceeds arising from the sale or disposal of any lands granted to the state by congress, or any other funds appropriated, levied or collected for educational purposes, shall be used for the support of any sectarian, denominational or private school, college or university." Art. 12, Sec. 3. See also Sec. 8, Enabling Act, supra.

"Every child of school age and of sufficient physical and mental ability shall be required to attend a public or other school during such period and for such time as may be prescribed by law." Art. 12, Sec. 5.

"No religious test shall ever be required as a condition of admission into the public schools or any educational institution of this state, either as a teacher or student, and no teacher or student of such school or institution shall ever be required to attend or participate in any religious service whatsoever." Art. 12, Sec. 9.

"Provision shall be made for the establishment and maintenance of a system of public schools which shall be open to all the children of the state and free from sectarian control, and said school shall always be conducted in English." Art. 21, Sec. 4.

Section 55–1102, N.M.S.A.1941 Comp., reads: "No teacher shall use any sectarian or denominational books in the schools or teach sectarian doctrine in the schools, and any teacher violating the provisions of this section shall be immediately discharged, his certificate to teach school revoked, and be forever barred from receiving any school moneys and employment in the public schools in the state. Provided, that this section shall not be construed to interfere with the use of school buildings for other purposes authorized by the county board after school hours."

This statute, substantially as above, has been in effect in New Mexico for many years.

Money for the support of our public school system comes from taxation and the income from lands granted the state by the Congress of the United States.

Without further prefatory material, we will now proceed with the determination of the issues in this controversy.

### Failure of Decree to Enjoin
### All Religious Teachers.

The first point raised by the appellants respects the refusal of the trial court to enjoin all of the Religious defendants from thereafter teaching in the public schools of New Mexico who the record shows violated

the provisions of Sec. 55–1102, N.M.S.A. 1941 Comp., supra.

■ It is true the findings and record show that many of the Religious who had taught religion and used sectarian books, such as the Baltimore Edition of the Catechism, in the public schools while employed as teachers were not enjoined. However, a study of the record reveals that violations were in different degrees and there were more violations by some teachers than by others. It is difficult to determine where the trial judge drew the line and an opinion by him revealing his mental process in this case (where he did a remarkably fine job) would have been of considerable assistance to us. However, as the granting or denial of an injunction is to a great degree a matter resting in the conscience of the Chancellor, we will accept his decision on this point and decline to direct an injunction against the Religious he did not enjoin for violating this statute. In reaching this decision we are not unmindful that members of the Religious have served as teachers in the communities involved for many years and have in the past rendered fine service in the cause of education in remote communities. The fact they were teaching religion in the public schools in violation of the state and federal Constitutions was well known to the school authorities, both local and state, by them condoned and in many cases encouraged.

## Effect of Relation Between the Religious and Their Church.

It is argued by the plaintiffs that members of the Religious are bound by their oaths of obedience to obey their superiors in the church. They quote from Codex Juris Canonici, the official body of laws and regulations governing the Roman Catholic Church, as follows:

"Canon 499. All members of Religious Orders are subject to the Roman Pontiff as their supreme Superior, to whom they owe obedience, also by virtue of their vow of obedience.

"Canon 501. Superiors and Chapters, according to their constitutions and common law, have right of dominion over their subjects.

"Canon 592. All religious are subject to the general obligations of the clerics in Canons 124 to 142 unless otherwise expressly stated.

"Canon 127. All clerics specially priests with special obligation must render obedience and reverence to the diocesan authority.

"Canon 128. As many times as the Church needs it, according to the Bishop's judgment, and unless a legitimate impediment prevents it, they must faithfully fulfill any obligation imposed on them by the Bishop."

A number of the Religious testified they were bound to obey their superiors, the

priest or the archbishop, in matters of religion, and that teaching of religion before or after classes was within the jurisdiction of their superiors. By virtue of Sec. 9 of Art. 12 of our Constitution, supra, no religious tests can be prescribed for any teacher, or a member of any faith denied the right to teach because of his or her religious beliefs. But do the vow of obedience and the historic position of the Roman Catholic Church as to public schools and their own schools, the fact that all money received for teaching by members of the Religious is turned over to their Orders (which it is claimed is state aid to religion), and the wearing of religious garb disqualify them from teaching in the public schools?

For the position or policy of the Roman Catholic Church as to schools, we have no better information than that given by Mr. Justice Jackson of the United States Supreme Court in his dissenting opinion in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 514, 91 L.Ed. 711, 168 A.L.R. 1392, as follows:

"The function of the Church school is a subject on which this record is meager. It shows only that the schools are under superintendence of a priest and that 'religion is taught as part of the curriculum.' But we know that such schools are parochial only in name—they, in fact, represent a world-wide and age-old policy of the Roman Catholic Church. Under the rubric 'Catholic Schools,' the Canon Law of the Church, by which all Catholics are bound, provides:

" '1215. Catholic children are to be educated in schools where not only nothing contrary to Catholic faith and morals is taught, but rather in schools where religious and moral training occupy the first place * * * (Canon 1372.)'

" '1216. In every elementary school the children must, according to their age, be instructed in Christian doctrine.

" 'The young people who attend the higher schools are to receive a deeper religious knowledge, and the bishops shall appoint priests qualified for such work by their learning and piety. (Canon 1373.)'

" '1217. Catholic children shall not attend non-Catholic, indifferent, schools that are mixed, that is to say, schools open to Catholic and non-Catholics alike. The bishop of the diocese only has the right, in harmony with the instructions of the Holy See, to decide under what circumstances, and with what safeguards to prevent loss of faith, it may be tolerated that Catholic children go to such schools. (Canon 1374.)'

" '1224. The religious teaching of youth in any schools is subject to the authority and inspection of the Church.

" 'The local Ordinaries have the right and duty to watch that nothing is taught contrary to faith or good morals, in any of the schools of their territory.

" 'They, moreover, have the right to approve the books of Christian doctrine and the teachers of religion, and to demand, for the sake of safeguarding religion and morals, the removal of teachers and books. (Canon 1381.)' (Woywod, Rev. Stanislaus, The New Canon Law, under imprimatur of Most Rev. Francis J. Spellman, Archbishop of New York and others, 1940.)"

These being fundamental laws of the Church, the Religious having dedicated their services to the Church and the teaching of the youth, and our school authorities having condoned or even encouraged the Religious in the teaching of religion in the public schools, it is small wonder we find the Religious overstepping constitutional bounds. They were doing what they believed to be commanded by the Church and, of course, to be right in the eyes of their Lord. The question is are they so bound in their consciences and by the laws of their Church that they cannot serve as teachers in the public schools and perform their duties in accordance with the federal and our state Constitutions, as announced in People of State of Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649, 2 A.L.R.2d 1338, and the Everson case, supra.

The Religious have taken vows of poverty and all their earnings go to their respective Orders, the Religious in return receiving care, housing, clothing and maintenance. In all probability, the money received by the Orders exceeds such cost. However they receive only the same salary as other teachers and we do not feel this is the aid to religion or the church denounced by the federal and our state Constitutions. O'Connor v. Hendrick, 184 N.Y. 421, 77 N.E. 612, 7 L.R.A.,N.S., 402, 6 Ann.Cas. 432.

The Supreme Court of Missouri in the case of Harfst v. Hoegen, 349 Mo. 808, 163, S.W.2d 609, 613, 141 A.L.R. 1136, did bar the Religious from teaching in the public schools under constitutional provisions substantially like ours and on quite similar facts. In the course of the opinion it is stated: "There is another constitutional inhibition which respondents do not observe. It forbids a school district to make payments from any public fund to sustain any private or public school controlled by any sectarian denomination. Respondents might argue that the St. Cecelia school is controlled by the school board and not by the church, but we find from the record that the nominal supervision by the school board is but an indirect means of accomplishing that which the Constitution forbids. The statement of the county superintendent of schools that 'We put the St. Cecelia parochial school into the public school system' is fully borne out by the facts in evidence. It was not only put

there but it was maintained there with public funds."

The Sister Superior of the Order to which the Religious there belonged (Sisters of the Most Precious Blood) testified that members of her Order had dedicated their lives to teaching and to the Catholic faith, that she had given religious instruction in all her teaching experience and, finally, "that she could not teach any differently". In the course of the opinion, the court stated: "From her testimony (Sister Superior) we must conclude that the members of her religious order, their lives dedicated to the training of children both in religion and education, come within this constitutional interdiction as teachers of religion, and payment to them from public school funds is forbidden."

While the compulsory school attendance laws, public funds and public buildings may not be used for the teaching of sectarian religion, and, as stated in the Everson case, supra, and affirmed in the McCollum case, supra, there must be a wall of separation between church and state; still we are unwilling to follow the Missouri court on this point and bar the Religious as teachers in our public schools by virtue of their membership in a religious order.

### Ruling Respecting Wearing of Religious Garb by Public School Teachers.

The plaintiffs strongly urge that in any event the Religious should not be allowed to wear religious garb and insignia while discharging their duties as teachers, as this gives the Roman Catholic Church an advantage over all other churches and sects. In addition to the Everson and McCollum cases, supra, they rely on O'Connor v. Hendrick, supra, and Knowlton v. Baumhover, 182 Iowa 691, 166 N.W. 202, 5 A.L.R. 841.

In the O'Connor case the New York State Superintendent of Schools made a regulation prohibiting the wearing of religious garb by teachers in the public schools. One teacher, a member of a Roman Catholic Order, refused to comply with the regulation and brought suit for salary accruing after the effective date of the regulation. The constitution of that state provides substantially the same as ours, that public property, credit or money shall not be used directly or indirectly in the aid of any school under the control of any religious denomination. Applying this provision of the constitution to the facts as above noted, the court said: " * * * Here we have the plainest possible declaration of the public policy of the state as opposed to the prevalence of sectarian influences in the public schools. The regulation established by the state superintendent of public instruction through the agency of his order in the Bates appeal is in accord with the public policy thus evidenced by the fundamental law. There can be little doubt that the effect of the costume worn

by these Sisters of St. Joseph at all times in the presence of their pupils would be to inspire respect, if not sympathy, for the religious denomination to which they so manifestly belong. To this extent the influence was sectarian, even if it did not amount to the teaching of denominational doctrine. [184 N.Y. 421, 77 N.E. 614.]"

It is worthy of note the court approved the strong dissenting opinion of Mr. Justice Williams in Hysong v. Gallitzin Borough School District, 164 Pa. 629, 30 A. 482, 26 L.R.A. 203, 44 Am.St.Rep. 632, where a majority of the Pennsylvania court had refused to enjoin the wearing of religious garb in their public schools, quoting from the dissent as follows: " * * * The teachers, said Mr. Justice Williams * * *, 'come into the schools, not as common school teachers or as civilians, but as the representatives of a particular order in a particular church, whose lives have been dedicated to religious work under the direction of that church. *Now the point of the objection is, not that their religion disqualifies them. It does not. * * * It is not that holding an ecclesiastical office or position disqualifies, for it does not.* It is the introduction into the schools as teachers of persons who are by their striking and distinctive ecclesiastical robes necessarily and constantly asserting their membership in a particular church, and in a religious order within that church, and the subjec-

tion of their lives to the direction and control of its officers.' " (Emphasis ours.)

The O'Connor case was based on a regulation, but the reasoning of the court is equally applicable here. In view of the fact we now have a like regulation made by our State Board of Education, we give specific approval to the holding of the New York court on that subject.

. The O'Connor case and the dissenting opinion of Justice Williams in the Hysong case were likewise approved in Knowlton v. Baumhover, supra. The material facts in that case present a situation almost identical to the one we have in a number of schools in this case. A school building was closed and one room utilized as a public school was rented from the local priest of the Roman Catholic Church. A Religious was employed to teach in the public school room while another Religious taught in a room where a Roman Catholic parochial school was maintained. In the actual teaching, however, both rooms were operated the same, with the Religious teaching the catechism, having prayers and displaying Roman Catholic and religious pictures on the walls. When protest was made against the teaching of religion in the public classroom, it was discontinued, but the children of Catholic parents and others who wished to attend were marched to the adjoining church for religious instruction before school. The Iowa court

in an exhaustive review of the authorities held the so-called public school was in fact a Roman Catholic school; that wearing of religious garb and the crucifix was an introduction of sectarian religion in the school, bound to make a strong impression on all children. Therefore, the court required the school directors to forthwith move out of the church property and enjoined the payment of public money to the Religious for teaching in her garb. While the opinion is lengthy, it is an able one and should interest those concerned with the subject.

The Religious rely strongly on the case ✓of Gerhardt v. Heid, 66 N.D. 444, 267 N.W. 127, where the court refused to enjoin the Religious from teaching or the wearing of religious garb while teaching. However, it must be observed the court said there were no such conditions prevailing in the North Dakota school as had existed in the Iowa school. In the school before the court there was no teaching of religion or wearing of emblems, except for a few days at the opening of the school term, nor were there religious pictures on the walls. There is a strong intimation, as we read the opinion that if the conditions which obtained in the Iowa school had been present in North Dakota, a different result might have been reached.

█ So long as the resolution of March 6, 1951, by the State Board of Education barring the wearing of religious garb by teachers in our public schools is in effect and is enforced, there is, of course, no need for the issuance of an injunction preventing this practice. However, in view of the frequent changes in the personnel of the State Board of Education and the danger of a restoration of such practice, we feel compelled to announce our decision that the wearing of religious garb and religious insignia must be henceforth barred, during the time the Religious are on duty as public school teachers. We hold the trial court erred in denying an injunction on this feature of the case. Not only does the wearing of religious garb and insignia have a propagandizing effect for the church, but by its very nature it introduced sectarian religion into the school.

█ If the Religious are again employed as teachers in our public schools they must not dress in religious garb or wear religious emblems while in the discharge of their duties as such teachers. They must also refrain from the teaching of sectarian religion and doctrines and the dissemination of religious literature during such time. Furthermore, they must be under the actual control and supervision of the responsible school authorities. A church cannot be permitted to operate a school system within our public school system.

Cross Appeal of the Religious.

The first point raised by the Religious is that the trial court erred in enjoining the

rental of Church property for school purposes where the school authorities did not have absolute control of such building. They agree the school authorities must have such control during school hours, say 9:00 a. m. to 3:30 p. m., but not so in other hours.

■ A sufficient answer to this claim is the attorneys for cross appellants represent only the Religious. The title to the property is in the Archbishop and he is not a party to the suit. The school boards who were the tenants do not complain of the decree. Cross appellants have no standing to attack this portion of the judgment.

. Barring Certain of the Religious from Again Teaching.

Certain of the Religious were permanently barred as teachers in the public schools of New Mexico by virtue of the provisions of Sec. 55–1102, Supra, because they had taught sectarian religion in the public schools in which they were employed as teachers.

It is first claimed the regular religious instruction was given either before or after regular school hours, and that such time has not until the rendition of the decree in this case been considered as a time when "school is in session." It is further urged the statute is penal in nature and, therefore, requires a strict construction.

■ We have already pointed out that under the system in operation the school day actually embraced the thirty minute period devoted to religious instruction, in addition to such time as was devoted to prayers in some of the schools. The practices prevailing in each of the schools where religion was taught were so uniform that we must conclude they were a part of a general plan and design to circumvent the constitutional and statutory provisions prohibiting the teaching of sectarian religion in the public schools. The Religious are intelligent people and the course they pursued proves they were aware of the laws on the subject and the penalty. Neither are we impressed by the facts that county boards of education encouraged such practices and that members of the State Board of Education and other public officials charged with the enforcement of our laws ignored and even encouraged the violations. Nor does the fact that such violations have continued for a long period of time justify us in refusing to give effect to a statutory penalty passed in aid of applicable constitutional provisions. Constitutional and statutory provisions are not amended or repealed by the failure of officials to enforce them. State ex rel. State Tax Commission v. San Luis Power & Water Co., 51 N.M. 294, 183 P.2d 605. The Religious by their actions having made the thirty minute period a part of the regular school day and had the buses operate in cooperation with such plan, and, in addition, utilizing the com-

pulsory school attendance law, cannot be heard to say they were holding such religious classes only before or after school hours.

Appellee teachers next contend the punitive decree forever barring them is in the nature of a criminal penalty for violation of a statute so vague and uncertain as to deny them due process of law.

 We agree with their contention that the relationship between them and their school boards is protected by the federal Constitution against arbitrary deprivation or impairment. State of Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 58 S.Ct. 443, 82 L.Ed. 685, 113 A.L.R. 1482. We also agree that a penal statute so uncertain in meaning or capricious in application as to provide no intelligible standard is void. State v. Diamond, 27 N.M. 477, 202 P. 988, 20 A.L.R. 1527. We disagree, however, with their interpretation of the statute. It follows the prohibitions of Art. 12, Secs. 3 and 9 of our New Mexico Constitution, quoted supra, and need not be misunderstood by those who seek a reasonable interpretation. Neither do we agree that the trial judge arbitrarily or capriciously applied it. Conversely, it seems to us he was very charitable in its application.

 The Religious further urge that a specific intent on their part to violate Sec. 55–1102, supra, is a pre-requisite to its violation and constitutionality. To this we answer the record, in our opinion, clearly establishes such intent.

### Question of Failure to Exhaust Administrative Remedy.

The Religious appellees next urge this suit could not be maintained against them for violation of Sec. 55–1102, supra, until the plaintiffs had exhausted their administrative remedies provided by statute. Section 55–1113, N.M.S.A.1941 Comp., reads: "No teacher having a written contract shall be discharged except upon good cause and after hearing on written charges, which, together with written notice of the time and place of hearing, shall be served upon said teacher at least five (5) days prior to such hearing. Such teacher shall have the right to appeal within ten (10) days to the state board of education, which board shall hear the matter de novo at a time and place to be by it fixed and the decision of such state board of education shall be final. Pending its decision upon appeal, such teacher shall be entitled to receive the salary contracted for."

Section 55–105, N.M.S.A.1941 Comp., provides the State Board of Education shall have certain powers, and subsection (g) thereof is as follows: "1. To revoke teachers' certificates for incompetency, immorality or for any cause which would have withheld its issuance in the first instance, but action hereunder shall only be taken after service of the accusation upon

the accused person and hearing or opportunity to be heard thereon shall have been given the accused."

The procedure established by Sec. 55–1113, supra, is in general use by various boards and we have required such use before a teacher may be discharged. See Stapleton v. Huff, 50 N.M. 208, 173 P.2d 612. It is adequate where a board desires to discharge a teacher for cause, or to dispense with future services of one having tenure. However, no provision is made therein for proceedings by a dissatisfied taxpayer or citizen, and we are advised no rules for hearings on protests or action thereon have been established by the State Board of Education or any local board. The plaintiffs did attempt to use the machinery of such section in connection with the operation of the Dixon school and appeared before the Rio Arriba County Board of Education. As heretofore stated, they were denied a hearing by both the county and state boards. It is true they might have brought mandamus against the County Board, but with the violations that were known and condoned by the local board, and with no right of appeal to the state board from an adverse decision, such action would, indeed, have been an idle gesture. The same is true in the other counties where there were violations. With the known attitude of the state board and its violations of the Constitution with regard to a single system of text books and its aid to the Roman Catholic schools, an appeal to it would likewise have been an idle gesture. The provision for an appeal by the teacher only strongly indicates Sec. 55–1113, supra, is intended only for use by the local board when a majority of its members determines a hearing shall be held to decide whether the services of a teacher are to be discontinued.

The people of the State of New Mexico are not by this administrative act to be denied their constitutional rights to prevent the teaching of sectarian religion in their public schools and the expenditure of public funds in aid of sectarian or denominational schools, and to invoke a penalty for so doing.

### Jurisdiction of Equity Court.

The appellee teachers contend that apart from the question of administrative procedure, a court of equity has no jurisdiction to decree the individual defendants shall be forever barred from serving as teachers in the public schools of New Mexico, and that although the court may have had jurisdiction to enter the declaratory judgment and restrain the officials, it erred in forever barring appellees as teachers in the public schools.

Certainly the State Board of Education, after hearing, could have revoked the licenses of the teachers it found had taught religion, but there was no likelihood of the board as then constituted ever taking such

action, nor could there be any assurance future boards would not reinstate the violators. There is a presumption of law that officials will perform their duties, but the record in this case firmly establishes that the then state board was doing just the opposite in connection with the subject under discussion.

The penalty is drastic but it is the only one provided by statute, and the trial court invoked it only against those who had committed the more flagrant violations. We affirm the action of the trial court in this regard, except as to those teacher appellees we hereafter find were entitled to a dismissal for want of proof. To declare otherwise would leave the people of New Mexico who oppose the teaching of sectarian doctrine in the public schools helpless.

Failure of Proof Respecting Certain Religious Who Were Forever Barred.

It is next urged the decree denies due process of law to a number of appellee teachers as to whom no evidence whatever was introduced before the District Court, namely: Sister M. Genevieve, Sister Mary Jolenta, Sister Mary Severine, Sister M. Alexia, Sister M. Noberta, Sister M. Vicentia, Sister Viridiana, Sister Eulalia, Sister Anthony Louise, Sister Mary Ida, Sister John Ellen, Sister Mary Noel, Sister Michaela, Sister Mary Cyrill and Sister Ann Thomas. It is then said: "Under these circumstances, the decree barring such teachers forever from the public schools of New Mexico plainly deprives these teachers of liberty and property without due process of law and of equal protection of the laws of New Mexico."

With this statement, insofar as it is supported by the record, we heartily agree, but a painstaking search of the more than 2200 pages of testimony requiring many days of work shows the bald statement is true only in part. We summarize the result of our labor on this point as follows:

(a) We find no testimony in the record that Sister Mary Severine, Sister M. Noberta, Sister Vicentia, Sister Anthony Louise or Sister Mary Ida did or did not teach religion in the public schools or elsewhere.

(b) There is affirmative testimony that Sister Eulalia taught domestic science at Penasco and did not teach religion. There is no testimony to the contrary.

(c) There is affirmative testimony that Sister Michaela went to Tierra Amarilla as a teacher after the teaching of religion in that school had been discontinued, and that she did not teach religion. There is no testimony to the contrary.

(d) Sister John Ellen was principal for a time at San Juan School, Rio Arriba County, and later at Mount Carmel School in Socorro, but she was not a defendant and her name is not included in the decree.

(e) There is substantial evidence in the record that the remaining teachers taught

sectarian religion in the public schools while employed as teachers therein.

The writer of either brief could have saved us much time and labor here had he put forth a little effort and given us a summary of the record on the point. Instead, one carelessly stated there was no evidence to sustain the findings as to any named Sister, while the other with as little care entered a general denial.

That part of the decree enjoining the Sisters named in sub-paragraphs (a), (b) and (c) will be reversed and the lower court is directed to vacate the injunction as to them. It is affirmed as to the remainder.

### Validity of Declaratory Judgment Action Against State Officials.

One question remains and that respects the making of the State Board of Education and its members and the Educational Budget Auditor parties defendant in the case.

On hearing of a motion to dismiss as to these defendants, words were deleted from the complaint so as to leave them named solely as individuals, and the case proceeded to trial and judgment in that manner.

The decree as it related to the State Board of Education and Educational Budget Auditor has been set out above.

We say without qualification that the provisions of the decree under which these defendants were enjoined are correct if the trial court had jurisdiction to render them in a declaratory judgment action. We

held, however, in Taos County Board of Education v. Sedillo, 44 N.M. 300, 101 P.2d 1027, that such an action could not be maintained against a state officer without the consent of the State of New Mexico and no consent was given for the present suit. Although after amendment the complaint purports to be against the members of the State Board of Education (only two of whom are still in office) and the Educational Budget Auditor solely as individuals, it was in effect a suit against them as state officers and against state agencies. Vigil v. Penitentiary of New Mexico, 52 N.M. 224, 195 P.2d 1014. The injunction against these defendants must be dissolved.

We are advised the State Board of Education has by rule complied with the decree and in view of our declarations on the subject it is unlikely it will rescind or fail to enforce them.

In declaring the trial court correctly interpreted the law in enjoining these defendants, if there was jurisdiction to do so, we are departing from our rule of not making such declarations unless the matter is before us for decision. We do so only because of the grave importance of the matters involved, as was done by this court in First National Bank of Raton v. McBride, 20 N.M. 381, 149 P. 353.

Our holding on this point in no manner affects the remainder of the unreversed

part of the decree or its binding effect on the other defendants.

## Extent of Permissible Religious Instruction.

The question as to how much, if any, religious instruction may be given in a public school under the doctrine of an absolute wall of separation of church and state will, we. hope, be settled by the Supreme Court of the United States in a case now pending before it, namely, Doremus v. Board of Education, 5 N.J. 435, 75 A.2d 880, decided by the New Jersey court on October 16, 1950. As the highest court of our land has held the provisions of the First Amendment to the United States Constitution were made applicable to the various states by the Fourteenth Amendment, its decision will be binding on this court and the State of New Mexico. We have another case pending before us which involves only one school, Miller v. Mabry, our No. 5250, which will serve as a vehicle for the adoption of the correct rule when it is announced by our highest court.

New Jersey has a statute requiring the daily reading, without comment, of at least five verses of the Old Testament of the Bible in each school, and permitting the recital of the Lord's Prayer. The New Jersey court in the Doremus case, supra, in a strong and persuasive opinion, held that as the reading and recital are not designed to inculcate any particular dogma, creed, belief or mode of worship, the practice was not prohibited by the First Amendment of the United States' Constitution. This is the decision which will be reviewed. We think it better to await their decision than to announce a rule on the subject at this time. However, we take this occasion to say that while we oppose the teaching of sectarian religion or the giving of control of the state or any of its agencies to any sect or combination of sects, yet we know religion itself is so intermingled in the daily life of our people and in the administration of and in the affairs of state that no wall of absolute separation of religion and state can be maintained—but few would want it.

The judgment of the District Court will be affirmed in all things with the following exceptions:

(a) The enjoining of the Sisters where we have found there was no evidence to support a finding they taught religion. The injunction as to them will be vacated.

(b) Its refusal to bar the wearing of religious garb by teachers in public schools while in the discharge of such duties. The decree shall be modified in accordance with the ruling of this court.

(c) The enjoining of the members of the State Board of Education and the Educa-

tional Budget Auditor. The injunction as to them will be vacated.

It Is So Ordered.

LUJAN, C. J., and SADLER, COMPTON, and COORS, JJ., concur.