[File No. 6381.]

G. GERHARDT et al., Appellants, v. ETHELINE HEID et al., Repondents.

(267 N. W. 127.)

Opinion filed April 2, 1936.

*Jacobsen & Murray,* for appellants.
*Otto Thress,* for respondents.

CHRISTIANSON, J.   This is an action brought by the plaintiffs as electors and taxpayers of Gladstone school district in Stark county against the directors and other officers of said school district and four teachers in the schools in the district.   The object of the action is to restrain the teachers from wearing what is denominated "a religious

garb or dress" while engaged in teaching; to enjoin the school officers from paying the said teachers any money from the treasury of the school district, and to require the directors of the school district to prohibit the teachers from wearing such religious garb, dress, or insignia while engaged in teaching.

The case was tried to the court without a jury and resulted in findings and conclusions in favor of the defendants. Judgment was entered accordingly and the plaintiffs have appealed.

The material and undisputed facts are substantially as follows: The defendant school district maintains and operates what is known as a town consolidated school in the village of Gladstone in which instruction is given in the grades and in high school subjects. During the term opening in September, 1935, there were six teachers employed in such school; four of these teachers were nuns, members of the Sisterhood of St. Benedict. It is undisputed that they were all duly qualified for employment and held proper certificates entitling them to teach in the public schools of Stark county. It does not appear what subjects these teachers taught. It is not claimed that any of them served as superintendent, and upon the record the reasonable inference is that one of the other two teachers employed by the school district served as superintendent. There is no claim and no evidence that any religious instruction was given, or that any religious exercises were conducted.

A Catholic priest, called as a witness by the plaintiffs, testified that the members of the Sisterhood of St. Benedict, as a part of their vows of admission, renounce ownership of personal property; and that they turn over to the Motherhouse the proceeds of any compensation they may receive for services rendered, after their living expenses, clothing and maintenance have been paid. That in turn there rests upon the Motherhouse of the Order to which such moneys or properties are given an obligation to care for the members and that upon retirement they are privileged to return there and be cared for during the remainder of their lives. He further testified that the members of the Sisterhood are required to wear a certain garb, but that they may be released from this requirement; that the members of the Order do not all wear the same garb, but that ordinarily those engaged in the same type of work wear the same type of garb; that, for instance, those engaged in nursing

wear the same garb, but that this is different from that worn by those engaged in teaching, and that both would differ from that worn by one who works in a garden. He further testified that the garb worn by the Sisters in question here was of a dark color, and that the members of the Sisterhood ordinarily wear a rosary hanging from their sides from a belt, but that this is not obligatory. He further testified that the Sisters, while employed as teachers, will be and are governed by the rules of the particular school authorities, by whom they are employed, in the conduct of the schools.

The evidence in this case is to the effect that the teachers in question wore the habit customarily worn by them as members of the Sisterhood but that they wore no other religious insignia except during the first four days when they carried a rosary hanging from their sides from a belt, but that this practice was discontinued. There was testimony by a girl who stated she attended school in all four days, that at one time she observed one of the teachers wearing a cross appended to a chain around her neck; that she observed this as the teacher bent over a desk but that it was not discernible when she stood erect.

There is no evidence that the teachers in question were wearing rosaries or any religious insignia other than their distinctive dress at the time this action was brought.

The question in the case therefore resolves itself to whether the fact that the teachers in question contribute to the Order a large part of their earnings and wear their particular religious garb during school hours constitutes a violation of the constitution and laws of North Dakota and infringes the rights of the plaintiffs so as to entitle them to injunctive relief.

The right of religious liberty is guaranteed and safeguarded by the constitutions, both of the nation and of the state. The first amendment to the Federal Constitution provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the government for a redress of grievances."

This amendment merely restricts the power of Congress, and is not restrictive of the states. Permoli v. New Orleans, 3 How. 589, 609,

11 L. ed. 739, 748; Reynolds v. United States, 98 U. S. 145, 162, 25 L. ed. 244, 249. It was left to the several states to make provision in their constitutions for the protection of the citizens of the state in their religious liberty against action by the state government (4 Enc. U. S. Sup. Ct. Rep. 462), and an examination of the constitutions of the several states discloses a common intent to safeguard religious liberty against infringement by the state government.

An eminent writer on American constitutional law (Judge Cooley) said:

"A careful examination of the American constitutions will disclose the fact that nothing is more fully set forth or more plainly expressed than the determination of their authors to preserve and perpetuate religious liberty, and to guard against the slightest approach towards the establishment of an inequality in the civil and political rights of citizens, which shall have for its basis only their differences of religious belief. The American people came to the work of framing their fundamental laws, after centuries of religious oppression and persecution, sometimes by one party or sect and sometimes by another, had taught them the utter futility of all attempts to propagate religious opinions by the rewards, penalties, or terrors of human laws. They could not fail to perceive, also, that a union of Church and State, like that which existed in England, if not wholly impracticable in America, was certainly opposed to the spirit of our institutions, and that any domineering of one sect over another was repressing to the energies of the people, and must necessarily tend to discontent and disorder. Whatever, therefore, may have been their individual sentiments upon religious questions, or upon the propriety of the State assuming supervision and control of religious affairs under other circumstances, the general voice has been, that persons of every religious persuasion should be made equal before the law, and that questions of religious belief and religious worship should be questions between each individual man and his Maker." 2 Cooley, Const. Lim. 8th ed. p. 960.

In furtherance of the fundamental American policy of religious liberty, provisions have been placed in the constitutions of the several states, varying in form and scope, inhibiting the use of public funds for the support of sectarian institutions of learning and safeguarding edu-

cational institutions supported and maintained by the state from sectarian control.

Cooley (2 Cooley, Const. Lim. 8th ed. pp. 966, 967) says:

"Those things which are not lawful under any of the American constitutions may be stated thus: . . .

"2. Compulsory support, by taxation or otherwise, of religious instruction. Not only is no one denomination to be favored at the expense of the rest, but all support of religious instruction must be entirely voluntary. It is not within the sphere of government to coerce it."

The Constitution of North Dakota provides:

Sec. 4. "The free exercise and enjoyment of religious profession and worship, without discrimination or preference shall be forever guaranteed in this state, . . . but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state."

Sec. 147. ". . . The legislative assembly shall make provision for the establishment and maintenance of a system of public schools which shall be open to all children of the state of North Dakota and free from sectarian control. . . ."

Sec. 152. "All colleges, universities and other educational institutions, for the support of which lands have been granted to this state, or which are supported by a public tax, shall remain under the absolute and exclusive control of the state. No money raised for the support of the public schools of the state shall be appropriated to or used for the support of any sectarian school."

It is not claimed that there is any statute applicable or pertaining to the matter in controversy here, and the plaintiffs predicate their right of action solely upon the above quoted provisions of sections 147 and 152 of the constitution.

The questions in controversy and presented for determination here therefore resolve themselves to these:

(1) Is the school in question here a sectarian school?

(2) Is it free from sectarian control; or is it under sectarian control?

The answer to these questions involves a consideration of the mean-

ing of the term "sectarian" as used in our constitution; or specifically what is meant by the terms "sectarian school" and "sectarian control."

The term "sect" as applied to religious bodies, refers to the adherents collectively of a particular creed or confession. It has been defined as "a party or body of persons who unite in holding certain special doctrines or opinions concerning religion, which distinguish them from others holding the same general religious belief." Century Dict. See also Webster's Int. Dict.; New Standard Dict.; 56 C. J. p. 1271.

Corpus Juris (56 C. J. p. 1272) says that the term "sectarian" when used as an adjective means, "denominational; devoted to, peculiar to, pertaining to, or promotive of, the interest of a sect, or sects; especially marked by attachment to a sect or denomination;" and that, "the term, in a broader sense, is used to describe the activities of the followers of one faith as related to those of adherents of another." It has been held that as employed in constitutional provisions like the ones in question here the term "sectarian" is most comprehensive in scope, and that constitutional provisions inhibiting the appropriation or use of moneys by a state to or for the support of any sectarian institution "forbid state aid to institutions affiliated with a particular religious sect or denomination, or which are under the control, domination, or governing influence of any religious sect or denomination, the ordinary understanding of the phrase 'sect or denomination' being a church, or body of persons in some way united for purposes of worship, who profess a common religious faith, and are distinguished from those composing other such bodies by a name of their own." Collins v. Kephart, 271 Pa. 428, 117 A. 440. A "sectarian institution" is "an institution affiliated with a particular religious sect or denomination, or under the control or governing influence of such sect or denomination; one whose purpose as expressed in its charter, and whose acts, done pursuant to powers conferred, are promotive of tenets or interests of a denomination or sect." 56 C. J. pp. 1272, 1273. It is a matter of common knowledge that the various religious sects or denominations maintain and operate institutions of learning. Such sectarian or denominational schools were in operation in the Territory of Dakota when our constitution was being framed and when it was adopted. Synod of Dakota v. State, 2 S. D. 366, 50 N. W. 632, 14 L.R.A. 418. When the framers of the constitu-

tion provided that "no moneys raised for the support of the public schools of the state shall be appropriated to or used for the support of any sectarian school" they doubtless had in mind sectarian schools as then commonly understood, that is, schools affiliated with or operated by, or under the control or governing influence of, some religious denomination or sect.

A case involving a sectarian school arose in our sister state, South Dakota, shortly after statehood. Synod of Dakota v. State, supra. The laws of the Territory of Dakota required the territorial Board of Education to designate private universities, colleges and academies in which instruction should be given to classes of not less than 10 nor more than 25, whose tuition should be paid by the territorial treasurer. Dak. Comp. Laws, §§ 1840–1845. In 1887 the Territorial Board of Education, pursuant to said statute, designated Pierre University, located at Pierre as one of the educational institutions in which a class of students might be taught, their tuition to be paid out of the territorial treasury. Pierre University accepted the designation and received students. In 1889 the states of North and South Dakota were created out of the former Territory of Dakota, and admitted into the Union. The constitution of South Dakota provided that "no money . . . . of the state shall be . . . appropriated for the benefit of any sectarian or religious . . . institution;" (S. D. Const. art. 6, § 3) and "no appropriation of . . . moneys . . . to aid any sectarian school shall ever be made by the state. . . . No sectarian instruction shall be allowed in any school aided or supported by the state." Article 8, § 16.

Pierre University was founded and maintained by the Presbyterian Church, and its primary purpose was to maintain and promulgate the doctrines and beliefs of the Christian Religion, as advocated by the Presbyterian Church. In 1890 students were admitted to Pierre University in accordance with the arrangement referred to above, and they were instructed as required by the Board of Education. The University presented a claim to the state for the tuition fees. The claim was rejected, and the University brought suit. The Supreme Court of South Dakota held that Pierre University was a "sectarian school," within the meaning of the term "sectarian school" as used in the con-

stitution; that the territorial laws under which the arrangement between the Board of Education and the University had been made were in conflict with the provisions of the constitution, and, hence, ceased to be operative when the constitution took effect.

The South Dakota case clearly involved a "sectarian school." While the students whose tuition was involved had been given secular instruction, yet the school was at all times affiliated with, and under the control and governing influence of, a religious body or sect.

Obviously the school in question here is not a "sectarian school" within the meaning of § 152 of the constitution. It is not affiliated with any particular religious sect or denomination. It is not governed or managed, nor are its policies directed or controlled, by such sect or denomination. It is one of the public schools of North Dakota, operated under the supervision, direction and control of the public officers of the state, county and district who, under the constitution and laws of the state, are charged with the administration, management and government of such public schools. The courses of study therein are prescribed by public officers and employees whose duty it is under our laws to prescribe such courses. The teachers in the school have received the certificates authorizing them to teach in the public schools of North Dakota upon compliance with the laws of the state; and they are as much subject to the control and direction of the superintendent of the school in which they teach, and of the county superintendent of schools and the state superintendent of public instruction as are other teachers in similar schools in the state.

The North Dakota constitution, however, does not merely inhibit the state from aiding or supporting sectarian schools; it further provides that all public schools shall "remain under the absolute and exclusive control of the state," and "shall be open to all children of the state of North Dakota and free from sectarian control." And it is contended by the plaintiffs that the school in question here is not free from "sectarian control;" but that, on the contrary, it is being conducted under sectarian influence and control in violation of the above quoted provisions of the constitution.

Questions relating to alleged infringement of analogous or somewhat similar constitutional provisions have come before the courts in many

cases; but the precise questions presented here, namely, whether such provisions are infringed because a teacher in a public school, who is a member of a religious order, wears the distinctive religious garb of such order, while engaged in teaching, and contributes a substantial portion of her earnings to such order, have arisen only in relatively few cases. Hysong v. School Dist. 164 Pa. 629, 30 A. 482, 26 L.R.A. 203, 44 Am. St. Rep. 632; Com. v. Herr, 229 Pa. 132, 78 A. 68, Ann. Cas. 1912A, 422; O'Connor v. Hendrick, 184 N. Y. 421, 77 N. E. 612, 7 L.R.A.(N.S.) 402, 6 Ann. Cas. 432; Knowlton v. Baumhover, 182 Iowa, 691, 166 N. W. 202, 5 A.L.R. 841.

In Hysong v. School Dist. 164 Pa. 629, 30 A. 482, 26 L.R.A. 203, 44 Am. St. Rep. 632, supra, the Supreme Court of Pennsylvania ruled that the wearing of the garb and the insignia of a religious society of the Roman Catholic Church by members of that society while engaged in teaching in the public schools "cannot be termed 'sectarian' teaching." In that case all the teachers in the school in question there, namely six in all, were nuns of the Sisterhood of St. Joseph and wore their religious garb, and certain religious insignia, such as rosaries, while in the performance of their duties as teachers. It was also stated (in the dissenting opinion) that they did not attend public examinations the same as other applicants for teachers' certificates; but that "they were examined in the seclusion of the 'Motherhouse' of their Order after having been selected by the Sister Superior in compliance with the written request of the directors." In the prevailing opinion in that case the court said:

"We cannot infer, from the mere fact that a school board composed of Catholics has selected a majority of Catholic teachers, that therefore it has unlawfully discriminated in favor of Catholics, because the selection of Catholic teachers is not a violation of law, or, which is the same thing, is not an abuse of discretion. Unless this be the case, no court has power to revise the exercise of this discretion, for the very sufficient reason that the law has not made the court school directors, while it has devolved on six citizens of Gallitzin borough the duties of that office.

"Nor does the fact that these teachers contributed all their earnings beyond their support to the treasury of their order, to be used for reli-

gious purposes, have any bearing on the question. It is none of our business, nor that of these appellants, to inquire into this matter. American men and women, of sound mind and 21 years of age, can make such disposition of their surplus earnings as suits their own notions. We might as well, so far as any law warranted it, inquire of a lawyer, before admitting him to the bar, what he intended to do with his surplus fees, and make his answer a test of admission. What he did with his money could in no way affect his right to be sworn as an officer of this court. Therefore, it would be impertinence in us to inquire.

"But it is further argued that, if the appointment of these Catholic teachers was lawful, they ought to be enjoined from appearing in the school room in the habit of their order. It may be conceded that the dress and crucifix impart at once knowledge to the pupils of the religious belief and society membership of the wearer. But is this, in any reasonable sense of the word, 'sectarian' teaching, which the law prohibits? The religious belief of many teachers, all over the commonwealth, is indicated by their apparel. Quakers or Friends, Omnish, Dunkards, and other sects, wear garments which at once disclose their membership in a religious sect. Ministers or preachers of many Protestant denominations wear a distinctively clerical garb. No one has yet thought of excluding them as teachers from the school room on the ground that the peculiarity of their dress would teach to pupils the distinctive doctrines of the sect to which they belonged. The dress is but the announcement of a fact,—that the wearer holds a particular religious belief. The religious belief of teachers and all others is generally well known to the neighborhood and to pupils, even if not made noticeable in the dress, for that belief is not secret, but is publicly professed. Are the courts to decide that the cut of a man's coat or the color of a woman's gown is sectarian teaching, because they indicate sectarian religious belief? . . . .

"In the 60 years of existence of our present school system, this is the first time this court has been asked to decide, as matter of law, that it is sectarian teaching for a devout woman to appear in a school room in a dress peculiar to a religious organization of a Christian church. We decline to do so. The law does not so say. The legislature may, by

statute, enact that all teachers shall wear in the school room a particular style of dress, and that none other shall be worn, and thereby secure the same uniformity of outward appearance as we now see in city police, railroad trainmen, and nurses of some of our large hospitals. But we doubt if even this would repress knowledge of the fact of a particular religious belief."

Subsequent to the decision in Hysong v. School Dist. supra, the Pennsylvania legislature enacted a statute to "prevent the wearing in the public schools . . . by any of the teachers thereof any dress, insignia, marks or emblems indicating the fact that such teacher is an adherent or member of any religious order, sect or denomination, and imposing a fine upon the directors of any public school permitting the same." The validity of the statute was assailed on the ground that it violated the provisions of the Pennsylvania constitution guaranteeing religious liberty. The Supreme Court of Pennsylvania sustained the statute, and quoted with approval what had been said in Hysong v. School Dist. supra, to the effect that the legislature might prescribe the style of dress to be worn by the teachers in the public schools. The court said: "It (the statute) is directed against acts, not beliefs, and only against acts of the teacher whilst engaged in the performance of his or her duties as such teacher." Com. v. Herr, 229 Pa. 132, 78 A. 68, Ann. Cas. 1912A, 422.

In O'Connor v. Hendrick, 184 N. Y. 421, 77 N. E. 612, 7 L.R.A. (N.S.) 402, 6 Ann. Cas. 432, supra, it was held that a regulation established by the state superintendent of public instruction, who had implied authority under the statute to establish regulations as to the management of the public schools, prohibiting teachers in public schools from wearing a distinctively religious garb while engaged in the work of teaching therein, was a reasonable and valid exercise of the power vested in him.

In Knowlton v. Baumhover, 182 Iowa, 691, 166 N. W. 202, 5 A.L.R. 841, supra, the contention that the public school there involved was under sectarian control was based on many grounds besides the wearing of the habit of a religious order. In that case the schoolhouse belonging to the school district was sold, and a room was leased in a building in which a parochial school was then being operated. The

building was immediately adjacent to a Roman Catholic church. There were two rooms in the building. At and prior to the time one of the rooms was leased by the school district, both rooms had been utilized for parochial school purposes. When the public school was moved into this building the teacher formerly in charge of the parochial school was employed as the teacher in the public school. As regards the conditions under which the public school was being conducted the Iowa court said:

"The building as a whole was to all intents and purposes a single schoolhouse, and the classes taught therein constituted for the express purpose of giving religious training to its pupils, and at the same time affording such pupils, as nearly as practicable, the equivalent of a common-school education. . . .

"Miss Martin, whose religious name is Sister Estella, and who was in charge of the upper room of the parochial school, was employed by the board of directors as teacher of the sub-district school, and she took charge, or rather she remained in charge of that room, while the lower room remained in charge of another sister of the same order, who continued to conduct it as an avowedly church school. The pupils in both rooms were organized and graded after the manner of a single school of two departments, the younger children being taught in the lower room, and the older ones in the upper. From the beginning, and for a period of more than nine years, the study of the Catholic catechism and the giving of religious instruction were part of the daily program of instruction in both rooms. The walls were hung with pictures of the Holy Virgin, of Christ crowned with thorns, of the Crucifixion, and others, all unmistakably appealing to Catholic sentiment, and the teachers were invariably arrayed in the striking robes of their order. . . .

"The act of the board in thus surrendering its proper functions and duties is not to be explained as a mere change in the location of the public school, or a mere exercise of the discretion which the law gives to the board to rent a schoolroom when circumstances render it necessary. It was a practical elimination of the public school as such, and a transfer of its name and its revenues to the upper department of the parochial school."

The facts in that case clearly distinguish it from this case. In that case the public school was in reality eliminated, and the pupils who formerly attended the public school were transferred to and given instruction in a parochial school.

As said, the Constitution of North Dakota not only forbids the appropriation of public funds for the support of sectarian schools but requires that all schools supported with public funds shall be "under the absolute and exclusive control of the state" and "free from sectarian control."

The word "control" has no legal or technical meaning distinct from that given in its popular acceptation. 13 C. J. p. 837. According to Webster's New International Dictionary "control" is "the act or fact of controlling; power or authority to control; directing or restraining domination, as under parental control." This is also the legal meaning of the term. State v. First State Bank, 52 N. D. 231, 202 N. W. 391; State v. Ehr, 52 N. D. 946, 204 N. W. 867, 870.

In carrying out the constitutional mandate that all public schools shall "remain under the absolute and exclusive control of the state" the legislature has provided by law for appropriate public officers and agencies as instrumentalities to exercise such control. As regards schools of the kind in question here it provided that "the district school board shall have the general charge, direction and management of the schools of the district, and the care, custody and control of all the property belonging to it." Comp. Laws 1913, § 1173. It also provided that "subject to the approval of the county superintendent it (the district school board) shall have power to determine what branches, if any, in addition to those required by law shall be taught in any school in the district." Comp. Laws 1913, § 1181. The legislature has also provided that "the county superintendent of schools shall have the general superintendence of the common schools in his county, . . . (Comp. Laws 1913, § 1123); that the county superintendent shall "decide all matters in controversy arising in his county in the administration of the school law or appealed to him from the decision of school officers or boards," and that an appeal shall lie from the decision of the county superintendent to the superintendent of public instruction. Comp. Laws 1913, § 1132. It has provided that the superin-

tendent of public instruction "shall have the general supervision of the public schools of the state" (Comp. Laws 1913, § 1107); that "he shall have charge and supervision of the certification of teachers, standardization of schools . . . and preparation of courses of study for the several classes of public schools" (1925 Supplement, § 1109); and "shall decide all appeals from the decision of the county superintendents." Comp. Laws 1913, § 1110.

The state has no concern with or control over the religious faith or belief of its citizens, except that of protecting each citizen in the enjoyment of the religious liberty guaranteed by the constitution. The fundamental theory of liberty upon which the government of our nation and state rests recognizes that while it is the duty of the state to establish free schools, open to every child, nevertheless there is no "general power of the state to standardize its children by forcing them to accept instruction from public teachers only;" that "the child is not the mere creature of the state;" and that "those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." Pierce v. Society of Sisters, 268 U. S. 510, 535, 69 L. ed. 1070, 1078, 45 S. Ct. 571, 39 A.L.R. 468.

It follows from the plain language of the provisions of our constitution that a parent has the right to instruct and guide his own children in religious training and that the state has no right to interfere therewith either directly, or indirectly, by means of sectarian instruction or exercises in the public schools; also that no person has the right to ask that the state through its school system, either directly or indirectly, impose upon other children the religious views which he holds and desires to have taught to his children. The very principle of individual religious liberty necessarily implies that such liberty must be exercised by each to whom it is given so as not to infringe upon the equally sacred right of another who may hold different religious views or opinions.

Each person engaged in teaching in our public schools is, by our constitution, guaranteed the same religious liberty that applies to every other person; but the children who attend the public schools of the state and the parents of these children are afforded the same guarantee,

and there is the further guarantee that public funds shall not be used to support sectarian schools and that all public schools shall be free from sectarian control. It necessarily follows, therefore, that no teacher in any public school in North Dakota has a right, while engaged in teaching, to act as a proselyter in favor of any religious organization, sect, creed or belief.

In this case there is no evidence and no claim that any of the teachers departed in any manner from their line of duty and gave or sought to give instruction in religious or sectarian subjects or that they conducted or attempted to conduct any religious exercises, or that they sought to impress their own religious beliefs while acting as teachers. So far as the record discloses they were subject to and obeyed all orders given by the district school board, the superintendent of the school in which they taught, the county superintendent of schools, and of the state superintendent of public instruction. The sole complaints are: (1) that while giving instruction they wore the habit of their order; and (2) that they contributed a large portion of their earnings to the order of which they are members.

We are all agreed that the wearing of the religious habit described in the evidence here does not convert the school into a sectarian school, or create sectarian control within the purview of the constitution. Such habit, it is true, proclaimed that the wearers were members of a certain denominational organization, but so would the wearing of the emblem of the Christian Endeavor Society or the Epworth League. The laws of the state do not prescribe the fashion of dress of the teachers in our schools. Whether it is wise or unwise to regulate the style of dress to be worn by teachers in our public schools or to inhibit the wearing of dress or insignia indicating religious belief is not a matter for the courts to determine. The limit of our inquiry is to determine whether what has been done infringes upon and violates the provisions of the constitution.

The fact that the teachers contributed a material portion of their earnings to the religious order of which they are members is not violative of the constitution. A person in the employ of the state or any of its subdivisions is not inhibited from contributing money, which he or she has earned by service so performed, for the support of some reli-

gious body of which he or she is a member. To deny the right to make such contribution would in itself constitute a denial of that right of religious liberty which the constitution guarantees.

It follows from what has been said that the judgment appealed from is right. It must be and it is affirmed.

BURKE, Ch. J., and MORRIS, NUESSLE and BURR, JJ., concur.