**J. C. RAWLINGS, Appellant,**

**v.**

**Wendell P. BUTLER, Supt. of Public Instruction of Commonwealth of Ky., et al., Appellees.**

Court of Appeals of Kentucky.

Feb. 10, 1956.

Rehearing Denied June 22, 1956.

Eugene Siler, Williamsburg, for appellant.

S. Arnold Lynch, Louisville, amicus curiae for American Civil Liberties Union.

J. D. Buckman, Jr., Atty. Gen., Jo M. Ferguson and M. B. Holifield, Asst. Attys. Gen., for appellee Supt. of Public Instruction.

E. C. Moore, Liberty, Robert M. Spragens, Lebanon, James R. Watts, Brandenburg, Chester O. Carrier, Leitchfield, Joseph Polin, Springfield, John C. Talbott, Bardstown, Talbott & Fulton, Bardstown, for appellee County Boards of Education.

James W. Stites, Louisville, amicus curiae.

SIMS, Judge.

This appeal is from a judgment of the Franklin Circuit Court denying an injunction and dismissing the complaint. J. C. Rawlings, as a citizen and taxpayer of Marion County, brought this class action against Wendell P. Butler, Superintendent of Public Instruction in Kentucky, and the Boards of Education of Casey, Marion, Washington, Nelson, Meade and Grayson Counties, in which he questioned on constitutional grounds the right of the State Superintendent and of the respective Boards of Education to expend public tax money in the payment of the salaries of nuns of the Roman Catholic Church teaching in the public schools of these counties when dressed in religious garb and wearing symbols of their religion; as well as the payment of rent to the Catholic Church for buildings in which public schools are taught; and the cost of transporting Catholic children to parochial schools. An injunction was asked against appellees to prevent them from this averred illegal expenditure of public funds raised by taxation, and of school funds.

The case was tried before the court upon a stipulation which showed these facts. The Sisters are all members of orders or religious communities within the Roman Catholic Church and each recognizes the Pontiff of that church as her spiritual superior. She lives and teaches under her religious name, and regularly turns over her compensation as a teacher, after de-

803

ducting living expenses, to her order or religious community. "She has assumed the religious relationship peculiar to her order, and has taken a vow of chastity, poverty, and obedience as hereafter defined. She owes obedience to the superiors of her order in spiritual matters; the reference to 'poverty' means that each sister delegates to some other person the right to control and manage any property which she might own."

It is further stipulated, "These Sisters, at all times during their teaching services, wear clothing similar to the following: 'The Dominican Sisters' Habit comprises a tunic and scapular of white wool. The tunic is girded with a leather belt to which is attached a rosary. The head is covered with a veil, a guimpe and a white linen headband. A mantle of black wool is worn when traveling.'"

The stipulation shows that the various County School Boards involved have the following number of Sisters teaching in their public, tax-supported schools: "Casey County, 2 Sisters; Marion County, 43 Sisters; Washington County, 9 Sisters; Nelson County, 13 Sisters; Meade County, 14 Sisters; Grayson County, 3 Sisters."

It is stipulated the school boards of these counties conduct public schools in properties owned by the Catholic Church and rented to the boards at the following prices: "Casey County—1 building—rent free; Washington County — 1 building — rent free; Marion County—various rooms—$75 per room per year; Nelson County—1 building—$900 per year; Meade County—1 building—$32 per year and 1 building—$200 per year; Grayson County—1 building—$2400 per year."

That part of the stipulation relating to the transportation cost of children shows the Nelson County Board of Education expended for transportation of pupils during the school year 1953–1954 a total of $66,198.13, including a depreciation of 10% on school buses, amounting to $7,372.94; that parochial pupils are 19.1 per cent and public school pupils are 80.9 per cent of the total number of pupils transported; that the

Nelson County Fiscal Court for that school year appropriated $10,000 to the County School Board under KRS 158.115 for the transportation of elementary pupils of parochial schools; that the school buses travel a total of 1,731.5 miles per day in picking up all students in Nelson County, with a total of 1,568 stops made per day, of which 222 stops are for parochial students only; that the total mileage occasioned by picking up parochial students only is 23.1 miles.

At the outset of his brief appellant explains he does not question the scholastic standards or the moral qualifications of the Sisters to teach in public schools; and he does not question the right of the "ordinary Roman Catholic citizen to teach in our free public schools." Nor does appellant contend the Sisters teach the tenets of the Catholic Church. His sole objection to their teaching is based upon the fact they wear their religious garb and emblems in the classrooms and donate their compensation to their respective religious orders after the payment of their living expenses.

The framers of the Federal Constitution, as well as the authors of the Constitutions of the various States, were careful "to preserve and perpetuate religious liberty, and to guard against the slightest * * * inequality in the civil and political rights of citizens, which shall have for its basis only their differences of religious belief. * * * The general voice has been, that persons of every religious persuasion should be made equal before the law, and that questions of religious belief and religious worship should be questions between each individual man and his Maker." 2 Cooley's Const.Lim. 8 Ed. p. 960.

Judge Cooley further wrote, "Those things which are not lawful under any of the American Constitutions may be stated thus: * * * Compulsory support, by taxation or otherwise of religious instruction. Not only is no one denomination to be favored at the expense of the rest, but all support of religious instruction must be entirely voluntary. It is not within the sphere of government to coerce it." 2 Cooley's Const.Lim. 8 Ed. pp. 966, 967.

Article 6 and the First Amendment of the Federal Constitution and §§ 1 and 5 of the Kentucky Constitution guarantee religious freedom to the citizens of this Commonwealth; while §§ 171 and 189 of our Constitution forbid the use of money raised by taxation for public purposes, or for educational purposes, to be used in the aid of any church, sectarian or denominational school.

While the dress and emblems worn by these Sisters proclaim them to be members of certain organizations of the Roman Catholic Church and that they have taken certain religious vows, these facts do not deprive them of their right to teach in public schools, so long as they do not inject religion or the dogma of their church. The garb does not teach. It is the woman within who teaches. The dress of the Sisters denotes modesty, unworldliness and an unselfish life. No mere significance or insignificance of garb could conceal a teacher's character. Her daily life would either exalt or make obnoxious the sectarian belief of a teacher.

 Our General Assembly has not yet prescribed what dress a woman teaching in the public schools must wear, or whether she may adorn herself with a ring, button, or any other emblem signifying she is a member of a sorority. These Sisters are not teaching religion in the public schools or attempting to force their religious views on the pupils under their charge. The religious views of these Sisters and their mode of dress are entirely personal to them. If they were prevented from teaching in the public schools because of their religious beliefs, then they would be denied equal protection of the law in violation of the Fourteenth Amendment of the Federal Constitution. Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213.

The question of the garb worn by Roman Catholic Sisters while teaching was before the Supreme Court of Pennsylvania in 1894 in Hysong v. Gallitzin Borough School District, 164 Pa. 629, 30 A. 482, 26 L.R.A. 203, 44 Am.St.Rep. 632, and before the Supreme Court of North Dakota 42 years later in Gerhardt v. Heid, 66 N.D. 444, 267 N.W. 127, and before the Supreme Court of Indiana in 1940 in State ex rel. Johnson v. Boyd, 217 Ind. 348, 28 N.E.2d 256, and we have reached the same conclusions those courts did. In answer to the argument in briefs for appellant that the garb of the Sisters within itself impresses on the children the religious faith of its wearer, we quote from the Hysong opinion, at page 484 of 30 A.:

"The religious belief of teachers and all others is generally well known to the neighborhood and to pupils, even if not made noticeable in the dress, for that belief is not secret, but is publicly professed. Are the courts to decide that the cut of a man's coat or the color of a woman's gown is sectarian teaching, because they indicate sectarian religious belief? If so, then they can be called upon to go further. The religion of the teacher being known, a pure, unselfish life, exhibiting itself in tenderness to the young, and helpfulness for the suffering, necessarily tends to promote the religion of the man or woman who lives it. Insensibly, in both young and old, there is a disposition to reverence such a one, and at least, to some extent, consider the life as the fruit of the particular religion. Therefore, irreproachable conduct, to that degree, is sectarian teaching. But shall the education of the children of the commonwealth be intrusted only to those men and women who are destitute of any religious belief?"

Appellant relies upon O'Connor v. Hendrick, 184 N.Y. 421, 77 N.E. 612, 7 L.R.A., N.S., 402, 6 Ann.Cas. 432, and Berghorn v. Reorganized School District, 364 Mo. 121, 260 S.W.2d 573. In the Gerhardt opinion the North Dakota Supreme Court expressly held the O'Connor case was not controlling because the Superintendent of Public Instruction of New York had implied statutory authority to prohibit teachers in public schools from wearing distinctive religious garb while teaching. It was held in the O'Connor opinion that forbidding nuns

to teach in public schools while attired in religious garb was a valid exercise of the statutory right of the Superintendent. North Dakota had no statute regulating the dress of school teachers, nor has Kentucky.

In the amicus curiae brief of the American Civil Liberties Union reliance is placed in Zellers v. Huff, 55 N.M. 501, 236 P.2d 949. But this opinion has no application here as it, like the O'Connor case, dealt with a regulation forbidding the wearing of distinctive church garb while teaching in the public schools. See 236 P.2d 964 for that part of the Zellers opinion dealing with this point. Nor can we agree with the contention of the amicus curiae that the doctrine of the Hysong case, as reiterated in the Gerhardt and the Boyd opinions, has been superseded or abrogated by Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, 168 A.L.R. 1392, and People of State of Ill. ex rel. McCollum v. Board of Education, etc., 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649, 2 A.L.R.2d 1338.

The Everson opinion sustained the New Jersey Court of Errors and Appeals in holding constitutional an Act of the New Jersey Legislature, N.J.S.A. 18:14–8, authorizing the payment of tax money for the transportation of children to a Catholic School, 133 N.J.L. 350, 44 A.2d 333. This Everson opinion has no bearing on the question of Sisters teaching in schools while wearing their habiliments.

The McCollum opinion held there was a violation of the First Amendment of the Federal Constitution by a practice of the Board of Education in releasing children, at the request of their parents, from classes to receive sectarian instruction in the school building by churchmen of their particular faith; while other children, whose parents did not desire them to take religious instruction, were kept in their classes. The court seemed to base its opinion on the fact that as Illinois has a compulsory school attendance law, the various denominations giving sectarian instructions to children in a school building were receiving aid from the State in so doing. Again, we say this opinion does not abrogate the doctrine expressed in the Hysong case.

It is rather interesting to note that in Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954, a case practically identical in facts with the McCollum case except the children on "released time" received their religious instruction outside the school, the majority held the First Amendment of the Federal Constitution was not violated. Mr. Justice Black, who wrote the majority opinion in the McCollum case, dissented on the theory that religious teaching was receiving some aid from the State, since the compulsory attendance law channeled the pupils into the hands and made them more accessible to those desiring to give them sectarian training, regardless of whether religion was taught in or out of the school building.

Mr. Justice Reed, in dissenting in the McCollum case, called attention to the fact that there were chaplains of various faiths in the United States armed services; in both Houses of Congress; in the United States Military Academy and in the Naval Academy; and under the Servicemen's Readjustment Act of 1944, 38 U.S.C.A. § 693 et seq., eligible veterans may receive training at government expense for the ministry in denominational schools; yet it could not with reason be said that the United States in so doing is diverting tax money to the aid of religion.

We agree with what Mr. Justice Jackson said in his concurring opinion in the McCollum case. It is next to impossible to teach history or literature without referring to the roles religion has played in the tragedy of mankind. He further states there are 256 separate and substantial religious bodies in this country and if we are to eliminate everything that is objectionable to any of these warring sects, or that which is inconsistent with their doctrines, "we will leave public education in shreds." [333 U.S. 203, 68 S.Ct. 477.]

An exhaustive treatment of this subject by Professor C. M. Hudspeth appears in 33 Texas Law Review 1035. He closes his discussion with this statement: "Americans are almost unanimous in their advocacy of separation of church and state * * *; they differ only concerning its application."

The Berghorn case, 364 Mo. 121, 260 S.W. 2d 573, upon which appellant leans heavily, is easily distinguished from the one here. There, no federal constitutional question was involved and the decision was based upon certain sections of the Missouri Constitution which are quite different from ours. Also, the facts in the Berghorn case are much different from those in the case at bar. The Missouri case shows that in some instances the nuns lived in the schools, which were surmounted by crosses; religious holidays were observed; religious instruction was given in some of the schools; and acolytes, or altar boys, were excused during school hours to attend weddings and funerals in the adjoining church. In effect, several of the schools involved in the Berghorn case were in reality Catholic schools rather than public schools with Catholic Sisters teaching in them.

We reach a more difficult question under § 189 of our Constitution: "No portion of any fund or tax now existing, or that may hereafter be raised or levied for educational purposes, shall be appropriated to, or used by, or in aid of, any church, sectarian or denominational school."

■ The United States Supreme Court in the Slaughter-House Cases, 16 Wall. 36, 127, 83 U.S. 36, 127, 21 L.Ed. 394, 425, wrote that labor is property and one has the right to dispose of property according to the will of the owner. The salaries paid these Sisters are theirs and they may do therewith as they choose. One employed by the state or any of its subdivisions is not forbidden under § 189 from contributing any part, or all, of the salary earned to a religious body of which he or she is a member. To deny such right of contribution would be a denial of religious liberty. Hysong v. Gallitzin Borough School District, 164 Pa. 629, 30 A. 482, 26 L.R.A. 203, 44 Am.St.Rep. 632; Gerhardt v. Heid, 66 N.D. 444, 267 N.W. 127, 135; State ex rel. Johnson v. Boyd, 217 Ind. 348, 28 N.E.2d 256.

■ From the stipulation in the record it appears the Sisters are paid like other teachers, and after providing for their living expenses, they contribute the balance of their compensation to the orders to which they belong. Their vow of poverty is not controlling from a legal angle. Many people are poverty stricken without taking such vows. The vow of obedience to ecclesiastical and secular authorities is not uncommon in the lives of people. No one can object to the vow of chastity. In Zellers v. Huff, 55 N.M. 501, 236 P.2d 949, at page 962, it was held there was no violation of the New Mexico Constitution, forbidding public funds to be used for the support of a church, when the Sisters turned over to the Catholic Church their compensation received as teachers after deducting actual living expenses. However, we would have a different question if these Sisters were but the conduits through which public school funds are channeled into the coffers of the Catholic Church. Then § 189 could be violated. But where the Sisters are paid separately and endorse their own checks, then they may dispose of their earnings as they desire.

■ We can see no constitutional objection to the various county school boards concerned in this litigation renting buildings from the Catholic Church in which to conduct schools, since the church in no manner attempts to influence or control the way the schools are conducted or operated or how they are taught. This question was disposed of contrary to appellant's contention in Crain v. Walker, 222 Ky. 828, 2 S.W.2d 654, at page 659. It was there written it was not the intention of § 189 to withhold the right to teach school in buildings rented from any particular religious denomination where that denomination did not attempt to influence or exercise any control over the school or how it was taught. From what is said in the Crain opinion on page 659 of Williams v. Board of Trustees, 173 Ky. 708, 191 S.W. 507, L.R.A.1917D, 453, it is evident that the facts in the Williams case distinguish it from the one at bar. In Kentucky Building Commission v. Effron, 310 Ky. 355, 220 S.W.2d 836, at page 838, we said § 5 of our Constitution was not violated when funds were given to a hospital carrying the name

of a religious denomination and governed by a board whose members were of a particular faith, in the event the hospital received patients regardless of faith or creed.

Here, the fact that two of the buildings were furnished free of rent by the Catholic Church and another was rented to the School Board for the nominal sum of $32 per year, does not affect the constitutional question so long as the church does not attempt to exercise any dominion or control over the school or classes taught therein and the Board has full and complete control of the buildings throughout the school year.

The stipulation does not show the buildings rented to the school boards by the church were under the same roof as the church or church school, or were immediately adjoining the church or the priest house, or that the nuns resided in the buildings rented to the county school boards, or that these buildings had religious emblems on them. The facts in the Berghorn case, 364 Mo. 121, 260 S.W.2d 573, 576, show such conditions did exist in Missouri. And it seems that practically the same conditions existed in New Mexico as in Missouri, because in the Zellers opinion, 55 N.M. 501, 236 P.2d 949, it is written on page 954, "In short, New Mexico had a Roman Catholic school system supported by public funds within its public school system." The record before us does not show the Catholic Church attempted in any way to influence the teaching in the schools conducted in the buildings and rooms rented from it, or attempted to exercise any dominion over these schools. So far as this record shows, they were conducted in the same manner as other public schools in the respective counties.

We find no provisions of the Federal Constitution or of the Kentucky Constitution which are violated by the Sisters teaching while wearing religious garb and emblems, or in donating to their religious orders the lion's share of their salaries, or in the various school boards renting buildings from the Roman Catholic Church in which public schools are conducted. As the circuit court so held, this part of its judgment is affirmed.

■ This court held unconstitutional an Act of the General Assembly of 1940, c. 66, allowing *school boards* in the State to expend school money in the transportation of children to secular or private schools. Sherrard v. Jefferson County Board of Education, 294 Ky. 469, 171 S.W.2d 963. At its 1944 session the General Assembly passed a bill, c. 156, permitting *fiscal courts* to contribute tax money to supplement the school bus transportation of *all* children attending primary grades who do not live within reasonable walking distance of their school. In Nichols v. Henry, 301 Ky. 434, 191 S.W.2d 930, 168 A.L.R. 1385, we upheld the constitutionality of this 1944 Act as one not designed to aid secular or private schools, but to protect *all* children from the hazards of the highway who under our compulsory attendance law were forced to attend school. It is patent that under the Sherrard opinion the School Board of Nelson County cannot use money raised by taxation for school purposes to aid in the transportation of children attending parochial or private schools. And it is just as plain under the Nichols opinion that the fiscal court may under KRS 158.115 bear the expense of transporting children attending parochial or private schools.

■ The complaint avers Nelson County Board of Education illegally expended between $3,000 and $5,000 for the transportation of parochial students during the school year in question. Appellant in his brief argues that this sum calculated under paragraph 10 of the stipulation (which deals with the cost of operating school buses) is $2,643.84 and asks that the Board be enjoined from using school funds in helping defray the expense of transporting parochial students. It is manifest if the fiscal court contributed sufficient funds to bear this extra cost of transportation, no person can complain; but if its contribution does not take care of this extra expense, the Board cannot make up the deficit by expending any of its school funds. The Nel-

son County Board asks us not to apply the "per capita" construction to paragraph 10 of the stipulation in arriving at the additional cost of transporting parochial students, but to arrive at it on the basis of the costs of extra buses which may be required in their transportation, or to arrive at this sum by the additional cost to the Board in operating its buses in picking up parochial students. Inasmuch as practically all school funds are distributed upon a "per capita" basis, and as most school expenses are determined upon such basis, we feel constrained to adopt the "per capita" method in determining this additional cost of transportation.

In the instant case this additional cost is 19.1 per cent of the total cost of the school bus system of Nelson County as the Catholic children equal 19.1 per cent and the children attending the public schools equal 80.9 per cent of all children transported to school in Nelson County. Should any peculiar or unusual circumstances exist which show the "per capita" method would not accurately or fairly reflect this additional cost of transportation, such circumstance may be taken into consideration in applying the "per capita" method in arriving at this additional cost.

 As the Nelson County Fiscal Court was not a party to the action, the circuit court properly decided it was without jurisdiction to determine the constitutionality of the fiscal court's appropriation. However, the Nelson County Board of Education was before the court, and the trial judge should have determined whether or not it expended school funds in the transportation of parochial students.

The judgment must be reversed for the trial court's failure to determine what, if any, sum the school board improperly expended in transporting parochial students. In so doing the trial judge will apply to paragraph 10 of the stipulation the rule set out in this opinion, and either party may introduce proof as to any unusual facts or circumstances affecting this cost. We suggest that the Nelson County Fiscal Court be made a party to the action upon its return to the circuit court so that it may be bound by any judgment rendered. In all other respects the judgment is affirmed.

The judgment is affirmed in part and reversed in part.

HOGG, J., dissents.

HOGG, Judge (dissenting).

In good conscience I cannot agree with the majority opinion. While I have no sectarian prejudice and no sense of religious intolerance, and while I profoundly respect the religious faith of the membership of the Catholic Church, as I do the creeds of all church denominations, at the same time I deeply respect and strongly adhere to the fundamental principle established by the wisdom of the founding fathers of the absolute and unequivocal separation of church and state.

It is the determined policy and purpose of the American people that our public school system, supported by taxation of all alike—Catholic, Protestant, Jew, believer and infidel—shall not be used directly or indirectly for religious instruction. Above all, that no school shall be made an instrumentality of proselyting influence in favor of any religious organization, sect, creed or belief. Knowlton v. Baumhover, 182 Iowa 691, 166 N.W. 202, 207, 5 A.L.R. 841. And, as said in that opinion: "To constitute a sectarian school or sectarian instruction which may not lawfully be maintained at public expense, it is not necessary to show that the school is wholly devoted to religious or sectarian teaching." What is generally regarded as sectarianism, or the special tenets of any branch of any church, whether it be Christian or Jew or Moslem, must not be directly or indirectly or subtly taught or inculcated in our system of public schools.

For ready reference I repeat the description of the striking and distinctive habiliments the Sisters wear in the schoolroom: "A tunic and scapular of white wool. The tunic is girded with a leather belt to which

is attached a rosary. The head is covered with a veil, a guimpe and a white linen headband. A mantle of black wool is worn when traveling." These robes of religious identification are familiar to the public, and the rosary, or prayer beads with a crucifix, are peculiarly Roman Catholic.

We have no statute prescribing the fashion of dress or prohibiting a uniform of any kind to be worn by teachers in the public schools. If wearing the Sisters' distinctive uniform, with its identifying religious insignia, is unlawful, it must be found in one or the other or both the Constitution of the United States and the Constitution of Kentucky. However, KRS 158.-190 prohibits the use of any "book or other publication of a sectarian" character and "No sectarian * * * doctrine shall be taught in any common school."

The First Amendment of the Federal Constitution contains this prohibition: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof". The Supreme Court has held that this became a restraint on the States by the adoption of the Fourteenth Amendment. 11 Am.Jur., Constitutional Law, Sec. 312. Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, 168 A.L.R. 1392.

Section 5 of the Constitution of Kentucky reads:

"No preference shall ever be given by law to any religious sect, society or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity; nor shall any person be compelled to attend any place of worship, to contribute to the erection or maintenance of any such place, or to the salary or support of any minister of religion; nor shall any man be compelled to send his child to any school to which he may be consci-entiously opposed; and the civil rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious

tenet, dogma or teaching. No human authority shall, in any case whatever, control or interfere with the rights of conscience."

Section 189 of our Constitution reads:

"No portion of any fund or tax now existing, or that may hereafter be raised or levied for educational purposes, shall be appropriated, to, or used by, or in aid of, any church, sectarian or denominational school."

These provisions in substantially the same language have been contained in all the constitutions of Kentucky.

It will be noted our Constitution is specifically positive in its prohibitions, while the Federal Constitution merely prohibits Congress from passing any law respecting the establishment of religion, and that has been expanded by judicial construction.

The distinctive garbs, so exclusively peculiar to the Roman Catholic Church, create a religious atmosphere in the schoolroom. They have a subtle influence upon the tender minds being taught and trained by the nuns. In and of themselves they proclaim the Catholic Church and the representative character of the teachers in the schoolroom. They silently promulgate sectarianism.

Indeed, these good women are the Catholic Church in action in the most fertile field—the impressionable minds of the children. The children and all others well know the Sisters have sacrifically withdrawn themselves from their own families and live separate and apart from them and from the world in convents or religious groups or communities which are always near or attached to the church edifice. They have discarded their family and legal names and live and teach under assumed religious names. Each of them is known and called "Sister" even as every Catholic priest is known and called "Father." They have withdrawn from all temporal affairs except such as are incidental to their charitable and religious lives. Many of us have highly appreciated the kind and devoted

ministrations of the Sisters in the Catholic Hospitals. We and all other patients were well aware, without it being expressed, that the nurses in their ministrations were in the service of their Church.

It is well known that the Catholic Church maintains its own parochial schools and forbids its children attending the public schools—as it has the perfect right to do. It is so provided in the Canon Law of the Church, as is stipulated in this record and published in many opinions of the courts, particularly in the dissenting opinion in Everson v. Board of Education, supra, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, 168 A.L. R. 1392. The children who attend the public schools and their parents are, with rare exceptions, Protestants. But by the majority opinion these children and their parents are deprived of their constitutional right to be free from sectarian influence and indirect teachings of the Catholic Church at public expense. It is of significance that the nuns pursue their vocations of nursing and teaching and charitable service in Catholic institutions excepting only when opportunity is afforded to teach in public schools; and Catholic children do not attend public schools except where teachers are nuns.

By their vows of poverty, no estate or money coming to the Sisters may be retained for their personal use. It is passed on to their Church and its activities, or, as is stipulated in this record, to the particular order or community as an integral part of the church. Thus, the nuns are but conduits through which pass the salaries received from the State. They are but the agents of a principal. They are subordinate and obedient in all things to their ecclesiastical superiors. The fact that the checks of the school authorities are drawn in their religious names and so endorsed, is a mere matter of form.

Let us examine the case law of the subject.

The employment of teachers who dress in their religious habiliments as affecting the public character of a school has been the source of much controversy, and, as might be expected, the decisions are based upon diversity of facts.

The majority opinion cites for support of the decision Hysong v. Gallitzin Borough School District, 164 Pa. 629, 30 A. 482, 26 L.R.A. 203, 44 Am.St.Rep. 623 (decided in 1894). That case has not been dealt with very gently. Six months after it was delivered the Pennsylvania legislature enacted a statute, with appropriate preamble as to policy and purpose, prohibiting any teacher from wearing in a public school or while engaged in the performance of his or her duty any " 'dress, mark, emblem or insignia indicating the fact that such teacher is a member or adherent of any religious order, sect or denomination' ". Act June 27, 1895, P.L. 395. The statute was sustained in Commonwealth v. Herr, 229 Pa. 132, 78 A. 68, 73, Ann.Cas.1912A, 422.

Three courts have expressly rejected the majority Hysong opinion—Iowa, New York, and New Mexico—and accepted the dissenting opinion. I have not found where any court has heretofore followed the majority opinion, except Gerhardt v. Heid, 66 N.D. 444, 267 N.W. 127, to which I shall later refer.

The Iowa Supreme Court in Knowlton v. Baumhover, 182 Iowa 691, 166 N.W. 202, 209, 5 A.L.R. 841, 853, expressly rejected the conclusions of the Hysong opinion, saying the court "distinctly [refuses] to recognize the authority of the majority opinion", and adopted and approved the following language from the dissenting opinion as being in accord with the weight of authority:

" 'They,' the teachers when thus arrayed, says the opinion, 'come into the schools, not as common school-teachers, or as civilians, but as the representatives of a particular order in a particular church whose lives have been dedicated to religious work under the direction of that church. Now the point of the objection is not that their religion disqualifies them. It does not * * *. It is not that holding an ec-

clesiastical office or position disqualifies them, for it does not. It is the introduction into the schools as teachers of persons who are by their striking and distinctive ecclesiastical robes necessarily and constantly asserting their membership in a particular church, and in a religious order within that church, and the subjection of their lives to the direction and control of its officers.' "

·Likewise, the New York court in O'Connor v. Hendrick, 184 N.Y. 421, 77 N.E. 612, 7 L.R.A.,N.S., 402, rejected the majority opinion in the Hysong case, and followed the minority opinion, saying that the distinctive religious costume of teachers who were members of a religious society connected with the Roman Catholic Church, worn at all times in the presence of their pupils, would tend to inspire respect, if not sympathy, for the religious denomination to which they so manifestly belonged, and to that extent the influence was sectarian, even if it did not amount to the teaching of denominational doctrine.

The New Mexico court likewise rejected the Hysong case in Zellers v. Huff, 55 N.M. 501, 236 P.2d 949, to be specially considered later on.

But there is one thing said in the Hysong opinion worthy of acceptance, that wearing the garb tends to promote religion; and, "Insensibly, in both young and old, there is a disposition to reverence such a one, and at least, to some extent, consider the life as the fruit of the particular religion." [164 Pa. 629, 30 A. 484.]

The majority opinion disregards O'Connor v. Hendrick, 184 N.Y. 421, 77 N.E. 612, 614, 7 L.R.A.,N.S., 402, 6 Ann.Cas. 432, and says it is not in point. The particular question was the validity of a regulation issued by the State Superintendent of Schools which prohibited the wearing of religious garbs by a teacher in the public school. But the Court went on to say that the regulation was in accord with "the plainest possible declaration of the public policy of the state as opposed to the prevalence of sectarian influences in the public schools." It added:

"There can be little doubt that the effect of the costume worn by these Sisters of St. Joseph at all times in the presence of their pupils would be to inspire respect, if not sympathy, for the religious denomination to which they so manifestly belong. To this extent the influence was sectarian, even if it did not amount to the teaching of denominational doctrine."

Gerhardt v. Heid, 66 N.D. 444, 267 N.W. 127, 134, is cited in the majority opinion as being in line with the Hysong case. The Gerhardt case involved the wearing of religious garbs in public schools. The decision was that such raiment did not convert a school into a "sectarian school" nor bring it within the meaning of the North Dakota Constitution, § 152, declaring that no public school taxes "shall be appropriated to or used for the support of any sectarian school." The case turned on the meaning of the word "control" which was defined as being " 'the act or fact of controlling; power or authority to control; directing or restraining domination' ". I think our constitutional provision is much broader.

The majority opinion properly distinguishes Berghorn v. Reorganized School District, 364 Mo. 121, 260 S.W.2d 573. Another Missouri case presenting like extreme conditions where a public school had substantially become a parochial school, is Harfst v. Hoegen, 349 Mo. 808, 163 S.W.2d 609, 141 A.L.R. 1136. The opinion is confined to the consideration of the question of payment of salaries to the nun teachers. The court held such payments violated the constitutional inhibition against the payment of public school money to sustain a school controlled by a sectarian denomination.

We have one Kentucky case which is in point in principle, Williams v. Board of Trustees Stanton Common School District, 173 Ky. 708, 191 S.W. 507, 514, L.R.A. 1917D, 453. The majority opinion says it is distinguishable. So it is as to the facts but

not as to the principle controlling the decision. Under contract, public school authorities used Presbyterian school property with two teachers paid by that denomination. The arrangement quite intimately fused the public and sectarian institution in the higher or college grades. A minority of the patrons objected to the arrangement. In an able opinion by Judge Carroll, this court expressed no disposition to doubt that the arrangement was beneficial to the children but found it "was opposed to the spirit of the laws, and its invalidity is not to be condoned" because the trustees and a majority of the patrons, or even every one of them, approved it. Said this court:

"The Constitution not only forbids the appropriation for any purpose or in any manner of the common school funds to sectarian or denominational institutions, but it contemplates that the separation between the common school and the sectarian or denominational school or institution shall be so open, notorious, and complete that there can be *no room for reasonable doubt that the common school is absolutely free from the influence,* control, or domination of the sectarian institution or school."

And further:

"The common school, however humble its surroundings or deficient its curriculum, is the most valuable public institution in the state, and its efficiency and worth must not be impaired or destroyed by entangling it in denominational or sectarian *alliances."* (My emphasis.)

Thus, this court has spoken most forcefully on the subject of separation of church and state.

In recent years, the Supreme Court of the United States has greatly expanded the meaning and application of the First Amendment and consistently kept the Church on one side and the State on the other from chipping away or penetrating the "wall of separation." The effect of two late decisions has been to nullify many previous State decisions.

The breadth and effect of the terse, simple provision of the First Amendment as to "establishment of religion" (applicable, as stated above, to the States) is exemplified in People of State of Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 467, 92 L.Ed. 649, 2 A.L.R.2d 1338. That opinion reversed the Supreme Court of Illinois and held that an "avowed atheist" with a child enrolled in a public school had the right to require the school board to prohibit religious instruction, even though attendance on the classes was with the express consent of the parents, on released time in classes conducted in a school building by outside teachers furnished by a religious council representing Catholic, Protestant and Jewish faiths, under the supervision of the superintendent of the school. The ground of the opinion was that the practice was a violation of the principle of separation of church and state.

In concurring opinions in the McCollum case, Mr. Justice Frankfurter and Mr. Justice Jackson, extensively reviewed the historical struggle, setting and development of the First Amendment. Justice Frankfurter wrote [333 U.S. 203, 68 S.Ct. 467]:

"Zealous watchfulness against fusion of secular and religious activities by Government itself, through any of its instruments but especially through its educational agencies, was the democratic response of the American community to the particular needs of a young and growing nation, unique in the composition of its people."

The several opinions, including the dissent by Mr. Justice Reed, eloquently and forcefully declare the strictness of the Constitutional principle. The majority opinion in this case seems to me to be at variance with their reasoning and conclusion.

Previously, in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 511, 91 L. Ed. 711, 168 A.L.R. 1392, the Court had

held the First Amendment to mean, at least, inter alia:

"No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State.'"

The opinion concludes: "That wall must be kept high and impregnable. We could not approve the slightest breach."

This was quoted and accepted, of course, as good law, in Zellers .v. Huff, 55 N.M. 501, 236 P.2d 949, which seems to be the latest decision on the subject. The New Mexico Court, as stated above, rejected the majority opinion in the Hysong case. It distinguished Gerhardt v. Heid, 66 N.D. 444, 267 N.W. 127, with the observation that there was no teaching of religion or wearing of emblems by the nuns except for a few days in the opening of the school term. Influenced by other state cases, but more particularly by the principles announced by the Supreme Court in the Everson and McCollum cases, the New Mexico court upheld a resolution adopted by the State Board of Education barring the wearing of religious garb by public school teachers. But that was not all, as the majority opinion indicates. After doing so, the Court wrote [55 N.M. 501, 236 P.2d 964]:

"However, in view of the frequent changes in the personnel of the State Board of Education and the danger of a restoration of such practice, we feel compelled to announce our decision that the wearing of religious garb and religious insignia. must be henceforth barred, during the time the Religious are on duty as public school teachers."

The garbs of the Catholic Sisters are not merely an odd mode or style of dress nor mere badges of office or tokens of sisterhood. The habit is strictly and prominently religious. Its purpose proclaims identity and doctrinal religious service.

If some of the many school-teachers who are members of the Baptist or Methodist or any other Protestant Church should withdraw from outside activities except those of their Church and reside in a community home apart from all other people and become subservient to ecclesiastical authority and wear some distinctive garb or uniform setting them apart from others of their profession and wear conspicuous badges prominently declaiming, "I am a Baptist," or Methodist, or the like, with insignia that they are devoting their complete lives in the service of their denominational churches; or if clergymen should go into the schoolroom as teachers wearing their canonical robes, with prayer books suspended from their necks, I would be the first to condemn the practice and to declare that this was the injection of the particular denominational religion into the schoolhouse and teaching of the children.

By no stretch of the imagination would I deny the Sisters the right to teach in our public schools. Let these Sisters when in the schoolrooms exchange their religious raiment and insignia for a dress or garment that is without distinctive suggestion and which does not itself proclaim sectarianism in action, and I shall be the first to approve.

Upon reason and authority, I respectfully dissent from the majority opinion to the extent indicated.